[No. 16514.  Department Two.  September 15, 1921.]

GRANT A. STEWART *et al., Appellants,* v.
WILLIAM P. ULRICH, *Respondent.*[1]

PARTNERSHIP (28)—LIABILITY BETWEEN PARTNERS—ACQUIRING ADVERSE INTEREST—FRAUD. · The fact that one partner in a firm operating a billiard-room had a secret agreement with the lessor of the premises to enter into partnership with him to go into the same business on termination of the lease, does not render him liable to his copartners in damages, where it is not shown that the acts were wrongful or fraudulent or to prevent a renewal of the lease, notwithstanding the assets of the partnership were sold to the lessor without knowledge of the facts.

Appeal from a judgment of the superior court for Spokane county, Lindsley, J., entered April 1, 1921, upon sustaining a demurrer to the complaint, dismissing an action for equitable relief. Affirmed.

*Allen, Winston & Allen,* for appellants.

*Turner, Nuzum & Nuzum* and *Wakefield & Witherspoon,* for respondent.

TOLMAN, J.—From an order sustaining a demurrer to the second amended complaint, and judgment dis-

[1]Reported in 201 Pac. 16.

missing the action, this cause is brought here on appeal. The sole question to be determined is, does the complaint state a cause of action.

After setting forth that the plaintiffs and the defendant had been copartners engaged in the operation of a billiard parlor, which had been very profitable financially, it is alleged that, on January 9, 1919, the partners entered into a written agreement, which is made a part of the complaint, by the terms of which Grant A. Stewart and Dayton H. Stewart, theretofore owners of a one-half interest in the business, sold to E. B. Stewart and William P. Ulrich one-half of their then interest, or a one-fourth interest in the business, and purported to lease to such grantees the remaining one-fourth interest which they retained, for a period of one year from January 5, 1919, for a consideration of $600 per month for the term. The agreement further provided for an inventory, assumption of indebtedness by the purchasing partners, and means by which the several interests and rights could be determined at the end of the year, and,

"It is further understood and agreed by and between the parties hereto that the partnership heretofore existing between the parties hereto shall be terminated, and that so long as the said parties of the first part shall maintain each an undivided one-eighth interest in said business, or either of the parties of the first part hereto shall own less than a one-fourth interest in said business, that neither of the parties of the first part herein shall have any right to dictate the policy of said business or be employed in said business without the consent of the parties of the second part herein, and that the interest of said parties of the first part after January 5, 1920, shall only be that of an owner of an undivided one-fourth interest in and to the fixtures, stock and appliances of said business, as above stated and referred to, and the parties of the second part shall only account to said parties of the

first part herein in that instance for an undivided one-fourth of the net profits of said business, after deducting a salary for each of the parties of the second part herein of thirty ($30) dollars per week."

And also:

"It is further understood and agreed by and between the parties hereto that the parties have a lease to the premises in which said business is now located, and that the said first parties do hereby transfer and assign unto said parties of the second part herein an undivided one-fourth ($\frac{1}{4}$) interest in and to said lease and do hereby retain an undivided one-fourth ($\frac{1}{4}$) interest in and to said lease; and in case said parties of the second part herein shall obtain a renewal or extension of said lease prior to its expiration or upon the expiration, and said parties of the first part are still the owners of said undivided one-fourth ($\frac{1}{4}$) interest in said business, then and in that event said parties of the first part shall be entitled to an undivided one-fourth ($\frac{1}{4}$) interest in said lease."

It is further charged in the complaint:

"Some time prior to the first day of December, 1919, the defendant conceived and placed into operation a plan and scheme to cheat and defraud the plaintiffs out of their interest in the aforesaid billiard parlor, whereby he could avoid his agreement contained in Exhibit 'A' to make the plaintiffs herein co-owners and jointly interested in any extension of the aforesaid lease.

"In pursuance of the said scheme and plan, he made and entered into an agreement either orally or in writing, the exact terms of which are to these plaintiffs unknown, whereby one James Durkin, the owner of and in charge of the property where the said business was being maintained and conducted, should refuse or fail to execute an extension of the old lease and whereby the property belonging to the parties hereto should apparently be sold to the said James Durkin who should thereafter conduct the said business. Pursuant to said scheme he procured and caused the said

Durkin to give a formal notice of the termination of said lease and of his refusal to extend or continue the same, or to grant a new lease, and notified the plaintiff that he desired possession of the premises. Pursuant to said scheme and plan to defraud, the defendant further urged and recommended to the plaintiffs that the parties hereto should sell to the said James Durkin at a low price, the property of the parties hereto, situate in said billiard parlor, and by his insistent advice and urging, the said plaintiffs, being ignorant of the facts hereinafter alleged, did agree to sell and did sell apparently to James Durkin, the personal property in said place of business for a sum not exceeding its actual cash value, as second hand goods at forced sale, with no allowance for good will, or lease of said premises.

"(5)    At all times since the time when defendant conceived the said scheme to defraud plaintiffs, defendant had an agreement, oral or in writing with the said Durkin, the exact terms of which are unknown to plaintiffs, and plaintiffs on information and belief aver the fact to be, that the said agreement was to the effect that the said Durkin would refuse to renew the said lease or make a new lease of said premises; that he should demand possession thereof from the plaintiffs hereto; that the said Durkin and the defendant should then, in reality, purchase from the parties hereto, the property aforesaid and continue to operate the said business, thereby excluding the plaintiffs from their rightful interest therein.

"(6)    That as a part and parcel of said scheme to defraud the defendant by reason of the representations aforesaid and not otherwise, procured the plaintiffs to enter into an agreement on the 22nd day of December, 1919, a true and correct copy of which is hereto attached marked Exhibit 'B' and made a part hereof, that the plaintiffs entered into said agreement solely and exclusively because of the fraudulent representations aforesaid and relying thereon and would not have entered into said agreement save and except for said representations."

Exhibit "B" referred to and made a part of the complaint, omitting the formal parts, is as follows:

"Whereas, the parties of the first part herein are the owners of an undivided one-fourth interest in and to that certain business known as the Imperial Billiard Parlors, situate at No. 415 Main avenue in the city of Spokane, county of Spokane, state of Washington.

"Whereas, the parties of the second part herein, have purchased from the parties of the first part herein, the entire interest in and to said business and all property of every kind, character and description belonging to the said parties of the first part, as evidenced by bill of sale this day executed by the parties of the first part to the parties of the second part herein; and,

"Whereas, it is the intention of the parties hereto to dissolve the partnership heretofore existing between the parties of the first part and the parties of the second part herein,

"Now therefore, in consideration of the sum of one ($1.00) dollar and other good and valuable considerations, the parties hereto do hereby agree that the partnership hereinbefore existing between the parties of the first part and the parties of the second part herein be, and the same is hereby dissolved, the parties of the second part herein assuming any partnership obligations as shown by the books of the company as of this date.

"It is further understood and agreed by and between William P. Ulrich and E. B. Stewart that whereas a contract has been entered into for the sale of said business as of February 1, 1920, that the partnership existing between the said E. B. Stewart and William P. Ulrich shall be dissolved as of said date and that the assets of said copartnership, after paying all debts and liabilities shall be distributed in equal portions to the said E. B. Stewart and William P. Ulrich."

The complaint charges the carrying out of the alleged scheme to defraud, and that the defendant and Durkin entered into possession of the business on

February 1, 1920, as equal owners, and have since conducted the same as such, deriving large profits, the share of which realized by the defendant up to the time of the filing of the complaint being about $100,000, and concludes with a prayer for an accounting; that the plaintiffs be decreed to be the owners of five-eighths of all profits accruing to the defendant from the business after February 1, 1920, and for general relief.

It is the contention of appellants that, notwithstanding the language of the contract of January 9, 1919, the partnership was not thereby terminated, and since the partners stood in a fiduciary relationship one to the other, any rights thereafter obtained by the defendant for his individual benefit to which the copartnership was entitled would be by him held in trust for the copartnership, a principle which we have heretofore approved in *Shrader v. Downing,* 79 Wash. 476, 140 Pac. 558, where it was said:

"It is undoubtedly the rule, as the appellant contends, that one member of a partnership must act in the utmost good faith towards his copartners, and that, if he purchases property for his individual benefit when the firm itself is entitled to the advantage of such purchase, or secures a valuable contract for himself which it was his duty to obtain for the firm, he will be treated as a trustee for the firm with reference to the transaction, and be compelled to account to his copartners for the profits acquired by reason thereof. But the rule does not absolutely prohibit a member of a partnership from engaging in enterprises in his own behalf, nor does it make all property acquired by a member of a partnership during its existence the property of the firm. The applicability of the rule depends on the facts of the particular case. One partner may not make a profit for himself individually out of the partnership business, or out of the transactions which he conducts privately which in justice and equity

ought to have been conducted in the partnership name; but he may, without laying himself liable to account, buy and sell real estate or other property with his individual means, if the transaction is disconnected from the partnership business, is not conducted in competition or rivalry therewith, and he is under no duty to conduct the transaction on behalf of the firm. Any other rule would prevent a member of a partnership from investing his private funds.''

The general rule with reference to the renewal of a lease by one partner is well stated in 16 R. C. L. 906, where it is said:

"413. Partners.—The doctrine now under consideration has been frequently applied in partnership cases where one partner, without the knowledge of his copartner, has taken for his own benefit a renewal of a lease held by the firm, and in such cases the lease so taken inures to the benefit of the firm, the partner taking it holding as a constructive trustee. When the lease is held by a partnership, the chance or opportunity of renewal is in itself a distinct asset of the partnership in which all the partners have an interest, and where the partnership is for a limited time it is nevertheless held that one partner has no right as against his copartner to take a new lease to commence after the expiration of the partnership by its own limitations. Even if the old lease is in the name of one partner alone, he cannot, where it is affected with an equity in behalf of his copartner, secure a renewal to himself to the exclusion of his copartner, but the renewal is considered to be a graft upon the old stock. So where the rule is otherwise applicable it is immaterial that the new lease is on different terms from the old one, or for a larger rent. Even after dissolution of the partnership the equitable expectancy of renewal remains a partnership asset for the purposes of liquidation, to be taken into account and disposed of for the common benefit of the partners, and hence a renewal after dissolution of the firm, taken by less than all the partners, inures to the benefit of the firm. And where the dissolution of the partnership had been

agreed upon, due to dissensions, the fact that the complaining partner had attempted, under a mistaken belief as to his right, to acquire a lease in his own name has been held not to deprive him of the right to demand that the new lease acquired by the other partner be treated as belonging to the partnership. On the other hand, it seems that if the negotiations for the renewal of the lease by one partner in his own name and for his own benefit were open and aboveboard, he will not be denied the benefit of the lease, and it has been held that where frank and open negotiations for a renewal were in progress, but were incomplete at the time of dissolution of a partnership by the death of one of the partners, a renewal subsequently taken by the surviving partner in his own name did not inure to the benefit of the deceased partner's estate, and it was immaterial that the negotiations provided for the continuance of the lease to the surviving partner alone in case of the death of the other, there being no concealment or bad faith. Still it has been said that although it cannot be laid down that in no case can a partner during the partnership contract for a new lease to himself exclusively of property let to a partnership, it is very difficult (and especially as regards a managing partner) to make out such a case, and the mere announcement to his partners of his intention to apply for such a lease after the dissolution is not sufficient to exclude their interest.''

But while we are in accord with those principles, they are not decisive of the point in issue, because it is not alleged that the respondent, Ulrich, had in fact secured a renewal of the lease; but from the complaint it appears that his possession of the premises in question is not an exclusive one, but is a joint possession with the owner for the purpose of conducting a business in which each are interested, the profits of which are to be divided between them.

Respondent contends that it is one thing for a partner to take a renewal of a lease in his own name which ought to have been taken in the firm name, and quite

another thing for him to defeat a renewal of the lease
by inducing the landlord to deny a renewal; claiming
that the averments of the complaint, when taken as a
whole, charge the defendant with no more than de-
feating a renewal of the lease; arguing that, while
equity will follow a renewal of a lease belonging to the
partnership into the hands of one of the partners and
treat it as the lease of the partnership, it will go no
further, and that no court of equity, so far as the re-
ported cases disclose, has ever treated the conduct of
a partner in defeating a renewal of a partnership lease
as the equivalent of the taking by him of a renewal
lease.   Industry of eminent counsel employed in the
case has wholly failed to produce any direct authority
pro or con upon this point.

It is further contended that the transaction com-
plained of constitutes no moral wrong and no equit-
able wrong, in that the respondent Ulrich was proceed-
ing in direct conformity with his legal and equitable
rights, because the lease mentioned in the complaint
expired on February 1, 1920, and in the absence of
allegations to the contrary, the law will presume that
the partnership was only for the duration of the lease.
The complaint being silent as to the time when the
partnership would terminate, we must assume that it
would terminate with the lease, *Zimmerman v. Hard-
ing*, 227 U. S. 489, 57 Law Ed. 608, or that it might be
terminated at will without giving rise to a cause of
action to recover damages for its disruption. 20 R. C.
L. 927, § 142.   In either event, with the certainty that
it must terminate February 1, 1920, or sooner if re-
spondent so willed, the gist of the complaint is that
respondent concealed the fact that he had made an
agreement to conduct a similar business in the prem-
ises with, or for, Durkin, the owner, and thus procured

the execution of the second contract, which definitely terminated the copartnership and made disposition of its assets. Durkin is not a party here. He had an absolute right to renew the lease or refuse to renew the lease, and his motives cannot be examined into. So, too, after the termination of the copartnership, Ulrich had an absolute right to engage in any business he pleased, with whom he pleased, and owed no duty to advise his partners in advance of his affairs. All were equally advised as to the nature, extent and value of the good will of the business, and to what extent that value was based upon the occupancy of the leased premises, and the effect thereon of the removal of the business to such other premises as might have been obtainable. Durkin's refusal to renew the lease was a known fact, and his reasons therefor, or what induced them, were immaterial. The complaining partners chose, under the conditions, to settle the partnership affairs, as shown by the last agreement, rather than undertake to continue the business in a new location, or otherwise dispose of the partnership assets, presumably because they deemed such a course most profitable to them. At the most, even to permit a recovery of damages flowing from the wrongful act, it must be made to appear that Durkin was ready and willing to renew the lease, and would have done so but for some wrongful and fraudulent act or acts done by respondent for the purpose of preventing such a renewal, resulting as intended. No such acts being charged in the complaint, we are not here called upon to determine whether a cause of action could be based thereon, and nothing herein contained is intended to indicate any possible holding upon such a case.

In any event, there is in the complaint no averment of any fraudulent representations made by respondent to the appellants, or either of them, which induced

them to enter into the contract of December 22, 1919. At the most he is charged with remaining silent as to his alleged agreement with Durkin, when it was his duty to have spoken. Is not the duty to speak always predicated upon the fact that silence may mislead others to their injury, and if no injury can or does follow the silence, how can there have been a duty to speak? If respondent was silent it resulted in what? In an agreement to terminate the copartnership then about to expire by limitation, or which could have been terminated at any time at the will of any partner without giving rise to a cause of action for damages resulting from its disruption, and in the disposal of certain personal property belonging to the copartnership for what is alleged to be no more than "its actual cash value as second-hand goods at forced sale, with no allowance for the good will of said business." Do these facts show a cause of action? The answer must be in the negative, because the opportunity to continue the business in other premises, if available, was equally open to all, and if the business could not be continued, there was no use for or value in the good will, and without a continuance of the business and the use of the good will it cannot be assumed that the property sold was worth more than it is alleged to have been sold for.

·If respondent had fully advised his partners of his agreement to enter into business relations with Durkin, and conduct a similar business in the same premises after the expiration of the lease and the partnership, how would their position have been altered, or what could they have done to bring about a better settlement? Knowledge of the facts could hardly have assisted them in inducing Durkin to renew the firm's lease; would not have enabled them to keep the part-

nership in being after February 1, 1920, or against the will of respondent; would not have enabled them to secure and retain the value of the good will of the business in any way except such as must have already been known to them, and consequently would not have enabled them to secure a greater price for their property sold. True, they might have refused to sell to respondent, or to Durkin, but there is no allegation or inference that they could have sold to better advantage to others.

We conclude that the complaint does not state a cause of action, and that the demurrer was properly sustained.

The judgment is affirmed.

PARKER, C. J., HOLCOMB, MAIN, and MITCHELL, JJ., concur.