[No. 27335. Department One. May 9, 1939.]

MARYLAND CASUALTY COMPANY *et al., Appellants,* v. THE CITY OF TACOMA *et al., Respondents.*[1]

[1]Reported in 90 P. (2d) 226.

74

*Charles T. Peterson, Thomas MacMahon,* and *Wright & Wright,* for appellants.

*Hayden, Metzger & Blair,* for respondent National Bank of Washington.

*J. Speed Smith* and *Henry Elliott, Jr.,* for respondent Queen City Construction Company.

*Harry R. Lea* and *H. G. Fitch,* for respondents Bachelor *et al.*

JEFFERS, J.—This is an appeal by Maryland Casualty Company, Glens Falls Indemnity Company, The Steel Tank & Pipe Company of Oregon, Felix Arcorace and Joe Coluccio, copartners, and T. A. Morrey, from judgments rendered in consolidated actions Nos. 78471 and 78581, Pierce county superior court, in favor of Queen City Construction Company, J. F. Bachelor, National Bank of Washington (formerly National Bank of Tacoma) as assignee of J. F. Bachelor, C. S. Barlow & Sons Company, Bergh-Griggs Company, and Frank Sussman. The appeals from judgments in favor of C. S. Barlow & Sons Company and Bergh-Griggs Company have been dismissed.

For brevity, we will hereinafter refer to Maryland Casualty Company and Glens Falls Indemnity Company as sureties, to The Steel Tank & Pipe Company as the Pipe Co., to Felix Arcorace and Joe Coluccio as the copartnership, and to Queen City Construction Company as Queen City.

About January 14, 1936, the Pipe Co. entered into a written contract with the city of Tacoma, whereby it

agreed to furnish and install approximately 12,160 feet of steel pipe and to construct certain structures, in accordance with a contract known as Federal docket No. 5594. This was a P. W. A. project, and the total contract price was over two hundred thousand dollars. Maryland Casualty Company and Glens Falls Indemnity Company were joint sureties on the bond of the Pipe Co., and guaranteed the faithful performance of the contract and payment of all laborers, mechanics, subcontractors, and materialmen, and all persons supplying the principal or subcontractors with provisions or supplies for carrying on the work.

On January 18, 1936, the Pipe Co. sublet to the copartnership all of the work to be done under the general contract, except the fabrication of the pipe and a few minor items. This subcontract provided, among other things, that the work was to be done and the materials furnished in accordance with the plans and specifications of Federal docket No. 5594, which plans and specifications were accepted as a part of the subcontract. It was further provided that the work should be completed within two hundred days from the date of the contract, and that the subcontractors should be responsible for all work to be performed under the contract after the delivery of the pipe by the general contractor. This subcontract was approved by the city of Tacoma and the P. W. A. director.

On May 7, 1936, the copartnership sublet to Queen City the following portions of the general contract: Clearing and grubbing, four thousand dollars; excavation at the rate of one dollar per lineal foot; backfilling at twenty-five cents per lineal foot; and excavation for J street control house, five hundred dollars. This contract further provided that monthly payments should be made, based on the estimates furnished by the city. While this contract was never filed with the city, Queen

City was recognized by all parties hereto as a subcontractor and was, in fact, a subcontractor.

On February 21, 1936, the copartnership sublet to J. F. Bachelor the concrete work to be done under the general contract.

The work under the general contract was not completed and accepted by the city until June 14, 1937. The city had retained the sum of $36,211.48, that amount representing fifteen per cent of the contract price; and after these suits were instituted, this sum was paid into court for the benefit of those having unpaid claims for labor and material. Many claims were filed with the city, and liens claimed against the fund. Among these claimants were Queen City, J. F. Bachelor, National Bank of Washington, T. A. Morrey, and Frank Sussman. These claims were all filed within the statutory period.

Controversy having arisen in regard to the claims filed and between the general contractor and the subcontractors, the sureties on the bond of the general contractor brought an interpleader suit in Pierce county, making parties defendant all persons claiming liens, and also the Pipe Co. and the copartnership. Queen City appeared in that action, and by way of answer and cross-complaint, set up its contract with the copartnership and further alleged that its prices were based upon the agreement that the copartnership would furnish full supervision for the work, and that the work would be completed within the two hundred days; that it entered promptly upon the performance of its contract, but that the copartnership did not carry out its part of the agreement, but soon after Queen City had commenced work, the copartnership withdrew practically all supervision from the job; that, by reason thereof, the work was prolonged and Queen City had to furnish additional supervision and incur additional expense;

that Queen City was not paid its monthly installments, as provided in the contract; that it was required to do extra work and furnish extra material; that the reasonable value of the labor performed and materials furnished was $32,817.26. Of this amount, Queen City was paid $7,167.02, leaving a balance of $25,815.72, for which amount it filed a claim with the city on April 27, 1937.

The copartnership answered the cross-complaint of Queen City, and admitted that Queen City furnished certain labor and supplies, but denied that the reasonable value of the same was more than $13,173.30; admitted that Queen City furnished other extras which, if allowed by the city, would entitle Queen City to an additional sum of approximately seven thousand dollars. It was further alleged that Arcorace, without the knowledge or consent of his partner Coluccio, and for the purpose of defrauding the copartnership, entered into a secret agreement with Queen City, whereby it was agreed that Arcorace should have twenty-five per cent of the profits made by Queen City on the contract, or if there was a loss, that Arcorace would stand twenty-five per cent of it; that, after this secret agreement was entered into, Arcorace induced Coluccio to sign the contract of May 7th, under which Queen City was to do the work; that Queen City refused to do certain work required of it under the contract and did not diligently and promptly carry out its part of the contract. It was denied that any delay was due to the acts of the copartnership.

The Pipe Co. and the sureties answered the cross-complaint of Queen City, and after denying liability, set up the agreement between Arcorace and Queen City, and alleged that they had no knowledge of this agreement until after the work was completed; that they did not have sufficient information to determine

what the effect of this contract would be. They further alleged that Queen City failed, within ten days after the date of the first delivery of material and supplies, to notify the principal contractor.

About the time the action hereinbefore referred to was begun, J. F. Bachelor instituted an action in Pierce county against the city of Tacoma, the Pipe Co., the sureties on the Pipe Co. bond, and the copartnership, alleging therein the execution of the general contract and his subcontract with the copartnership; that he started to perform work under his contract; that thereafter the contract was breached by the copartnership to such an extent that it was impossible for him to further perform his work, and that he was forced to abandon the job. He claimed in this action the sum of $5,995.80, as the amount due him as the reasonable value of the services performed, for which amount he claimed a lien against the bond of the principal contractor and the retained percentage.

The Pipe Co. and the sureties answered this complaint, denying liability, and by way of cross-complaint alleged that Bachelor had failed to perform his contract, had breached the same, and was forced by the city to give up the job. The copartnership also answered this complaint, denying liability, and by way of cross-complaint alleged that Bachelor had failed in many particulars to do the work according to the terms of his contract; that he finally abandoned the job, and that, to complete the contract, the copartnership was compelled to expend the sum of $5,908.50 in excess of the price for which Bachelor had agreed to do the work. The copartnership asked judgment against Bachelor for this amount.

T. A. Morrey, as agent of Glens Falls Indemnity Company, surety on the bond of Arcorace & Coluccio, took assignments of certain claimants who had furnished

labor and material to the copartnership and to Bachelor, and his cross-complaint asked for judgment on those claims. There was no contention as to the legality of these claims.

Frank Sussman intervened in the Bachelor action, and in his cross-complaint asked for judgment on two claims—one for $210.98 for material furnished Arcorace & Coluccio by the Frank Sussman Steel Company and the other for $247.87, of which $3.90 was for labor furnished by Michael Petrie, and duly assigned to Sussman.

The interpleader suit, the Bachelor action, and the claims of Morrey and Sussman were all consolidated and heard by the court without a jury, and thereafter judgment was rendered in favor of Queen City for $29,247.16, less the sum of $2,495.18 offset allowed the copartnership, and less the further sum of $7,167.02, being the amount paid on the contract, leaving a balance due of $19,584.96, together with interest at six per cent from April 27, 1937, and an attorney's fee of $2,500. Judgment was rendered in favor of J. F. Bachelor for $6,620, less the sum of $158.51, for material furnished by the copartnership, $2,769, for cash received, and the sum of $2,487.59, for claims assigned to, and paid by, T. A. Morrey, and less insurance paid by the copartnership, leaving a balance due Bachelor of $1,204.90, together with interest from July 2, 1937, and the sum of one thousand dollars attorney's fee. The copartnership was denied recovery on its cross-complaint. The judgment provided that the amount of $1,204.90, with interest, allowed to J. F. Bachelor, was for the use and benefit of National Bank of Washington. Judgment was rendered in favor of Frank Sussman against the Pipe Co., its sureties, and the copartnership, for $3.90, together with an attorney's fee of twenty-five dollars and costs, and against the copartnership alone for

$454.95. Only the item of $3.90 and the attorney's fee of twenty-five dollars were declared to be a lien against the retained percentage. Judgment was rendered in favor of T. A. Morrey and against the copartnership for $12,916.97, which was declared to be a lien against the retained percentage. No attorney's fee or interest was allowed. The judgments in favor of Queen City and Bachelor were declared to be liens against the retained percentage, and were against the copartnership, the Pipe Co., and the sureties. This appeal is from the judgment entered on the Queen City claim, the Bachelor claim, and the Frank Sussman claim.

We shall first discuss the claim of respondent Queen City.

It is first contended that the contract entered into between respondent Queen City and Arcorace was an immoral contract and against public policy, and was made with intent to defraud; that it entered into and became a part of the contract subsequently made on May 7th, between respondent and the copartnership; that the last named contract thereby became tainted with fraud and unenforcible; and that, therefore, respondent Queen City is not entitled to recover herein. We shall refer to the contract of May 1st, between Arcorace and Queen City, as the Arcorace contract, and the contract of May 7th, between the copartnership and Queen City, as the contract of May 7th.

We think it may be conceded that the relationship of a partnership is fiduciary in character and imposes upon the members of the firm the obligation of the utmost good faith in their dealings with one another with respect to partnership affairs. In discussing the partnership relation, we stated, in *Salhinger v. Salhinger*, 56 Wash. 134, 105 Pac. 236:

"In this relation is established the requirement of utmost good faith, and it follows that no partner may

deceive his copartners for his benefit and their injury, either by false representations or by concealment."

While it is often stated that agreements, the object or tendency of which is to constitute fraud or breach of trust on the part of one who stands in a fiduciary relation, are against public policy, it is more accurate to say that such contracts are illegal because they are, in effect, agreements to wrong or defraud the person whose interest the fiduciary has in charge. 13 C. J. 415, § 348.

We believe, however, that it is also the rule that there is nothing which is inherently fraudulent or against public policy in one member of a firm engaging in enterprises in his own behalf, provided he acts in good faith towards his partner (47 C. J. 795, § 237), and that any such act by a partner presents a different situation from that which is presented by the case of *McMullen v. Hoffman*, 174 U. S. 639, 43 L. Ed. 1117, 19 S. Ct. 839, and like cases, cited by appellants, where the contracts in question tended to limit competitive bidding on public work. Such contracts are inherently fraudulent and against public policy, regardless of the intent of the parties, and whether or not fraud was actually practiced.

In *Shrader v. Downing*, 79 Wash. 476, 140 Pac. 558, 52 L. R. A. (N. S.) 389, we stated:

"It is undoubtedly the rule, as the appellant contends, that one member of a partnership must act in the utmost good faith towards his copartners, and that, if he purchases property for his individual benefit when the firm itself is entitled to the advantage of such purchase, or secures a valuable contract for himself which it was his duty to obtain for the firm, he will be treated as a trustee for the firm with reference to the transaction, and be compelled to account to his copartners for the profits acquired by reason thereof. But the rule does not absolutely prohibit a member of a partnership from engaging in enterprises in his own behalf, nor

does it make all property acquired by a member of a partnership during its existence the property of the firm. *The applicability of the rule depends on the facts of the particular case.*" (Italics ours.)

To the same effect is *Stewart v. Ulrich*, 117 Wash. 109, 201 Pac. 16.

■ In *Tomkins v. Seattle Const. & Dry Dock Co.*, 96 Wash. 511, 165 Pac. 384, we stated:

"In determining whether a new contract is so connected with an illegal contract as to render it also illegal and void, the test is whether the plaintiff, to make a case, is required to resort to the illegal contract."

In speaking of the defense of illegality, in the case of *Wilder v. Nolte*, 195 Wash. 1, 79 P. (2d) 682, we stated that

"One who sets up the defense of illegality in an action of this kind has the burden of proof, first, because he who affirms always has the burden, and, second, because the defense, as is said in *McMullen v. Hoffman, supra,* [174 U. S. 639], 'is a very dishonest one, . . .' and 'is only allowed for public considerations and in order the better to secure the public against dishonest transactions.' "

Let us look at the facts and see what they disclose relative to the Arcorace contract and the one of May 7th. Under their subcontract, Arcorace & Coluccio were to have active charge of all the work to be done under the general contract, and were to supervise and direct the same. At the time the contract of May 7th was executed, the copartnership had a contract in Seattle, of which Joe Coluccio was in charge, and apparently Arcorace was interested at Aberdeen. The copartnership did not have the equipment available to do the work sublet to Queen City.

Arcorace was in charge of the work, and began to look around for someone to do the excavating, back-

filling, clearing, and grubbing, and he took the matter up with Mr. Badolato, president of respondent Queen City. The evidence shows that respondent had a good reputation for carrying through its contracts. However, at this time, respondent also had other contracts, and was not interested in the Tacoma job. Arcorace insisted that Badolato go over and look at the job, and several trips were made. Respondent was still unfavorable to taking over this work. There was talk about the price, and Arcorace submitted to respondent a proposed agreement, whereby respondent would be paid $1.25 per lineal foot for excavating and backfilling, and three thousand dollars for clearing and grubbing. This proposed agreement was not signed, and respondent made additional investigations, being reluctant to enter into any contract.

About this time, Arcorace, apparently being afraid respondent would not enter into a contract, informed Mr. Badolato that, if Queen City would agree to do the work, he would individually agree to stand one-fourth of the loss, if any, and would be entitled to one-fourth of the profits. Thereafter, respondent entered into the contract of May 7th, which provided respondent was to be paid four thousand dollars for clearing and grubbing, one dollar per lineal foot for excavating, twenty-five cents per lineal foot for backfilling, and five hundred dollars for excavating for J street control house. It is not claimed, nor could it be, that the prices respondent was to receive for the work under the contract were not fair and reasonable, as they were considerably less than the price the general contractor and the copartnership were to receive for the same work, with the exception of the excavation for the control house, which price was the same.

We are satisfied, after a careful examination of the evidence, that it was not the intention of Arcorace, by

making his contract with respondent, to defraud his partner, Coluccio; nor do we think it possible, under the facts, for that to have happened. We are convinced that the purpose of this contract was to make respondent believe that there would be a profit in the job, and to enable the copartnership to turn over this work to a firm which would carry it through, whether it made or lost. It is also evident that Arcorace wanted to get away from the job, for shortly after respondent furnished its bond, Arcorace left, and did not again appear upon the work.

We think it is apparent from the testimony that the general contractor knew about both contracts and seemed to think nothing of it; at least, it continued thereafter to deal with respondent and accepted the fruits of its work under the contract, as well as extra work and material furnished. While Joe Coluccio denied he knew about the Arcorace contract until after the work was completed, we cannot help but doubt the truth of this statement, as apparently did the trial court. Practically all the others about the job knew of it, and Badolato made no secret of it.

We think it quite significant that none of the appellants raised the question of the illegality of respondent's contract until respondent attempted to collect for the work done. It is also significant that the copartnership and the other appellants were represented by the same counsel, and that, while Arcorace was in court, he never took the stand to give his version of this matter. In other words, no attempt was made to show Arcorace intended to defraud his partner, other than as might be inferred from the contract itself, and certainly there was no evidence that anyone was defrauded.

The trial court, after seeing the witnesses, and after extended argument, stated:

"The court is of the opinion there is no proof that the contract between Arcorace and Queen City Construction Company is such an illegal transaction as to nullify or render unenforcible the contract between Queen City Construction Company and Arcorace and Coluccio. The court is of the opinion that the contract, Queen City Exhibit 2, is a binding and enforcible contract between Queen City Construction Company and Arcorace and Coluccio."

We entirely agree with the trial court.

Assignments of error 2, 3 and 4 are discussed together, and therein it is contended that the court erred in awarding judgment for damages against appellants, alleged to have resulted because of delays caused by the copartnership, and in awarding interest on that portion of the damages allowed by the court for delays.

Respondent's contention is that its action is not one for damages, but is for the reasonable value of the work done under the contract and the agreed and reasonable value of the extra work and material furnished under specific contract with the general contractor and subcontractor. It is conceded that all respondent can collect is the reasonable value of the services rendered and materials furnished. But respondent further contends that, where the one agreeing to pay for the work has not performed in accordance with his contract, then the limits of the contract price do not apply, and recovery may be had on the basis of the reasonable value under the conditions made necessary by the defaulting party.

It is first contended by appellants that respondent cannot recover for delays, for the reason that the general contract provides that the contract price therein recited shall cover all delays, and that the only right given therein is that an extension of time may be granted. We are of the opinion respondent is

not bound by the terms of the general contract. Its subcontract does not refer to the general contract or make it a part thereof, but only provides that respondent shall do certain work for the subcontractor at a certain price, which, as we have stated, is much less than the price to be paid the general contractor.

The rule has long been established in this state that, as against the bondsmen of the principal contractor, a subcontractor performing services or furnishing material cannot recover in excess of the reasonable value of the services performed or material furnished. *Kongsbach v. Casey,* 66 Wash. 643, 120 Pac. 108; *Hambach v. Ward,* 69 Wash. 351, 125 Pac. 140; *State Bank of Seattle v. Ruthe,* 90 Wash. 636, 156 Pac. 540; *Bishop v. Ryan Const. Co.,* 106 Wash. 254, 180 Pac. 126; *Puget Sound Bridge & Dredging Co. v. Jahn & Bressi,* 148 Wash. 37, 268 Pac. 169; *Nelson v. Seattle,* 180 Wash. 1, 38 P. (2d) 1034.

In the *Kongsbach* and *Hambach* cases, *supra,* the court laid down the rule that all that can be recovered is the reasonable value of the services or material, regardless of the contract price, but did not say whether or not the contract price should, in any case, be the limit of the recovery. This rule was apparently based upon the fact that the general contractor and his bondsmen were not parties to the subcontract and therefore could not be bound, by the terms of the contract, as to what was a reasonable price. The same reasons are advanced in *State Bank of Seattle v. Ruthe, supra.*

In the cases of *Bishop v. Ryan Const. Co.* and *Nelson v. Seattle, supra,* we recognized the right of a subcontractor to recover more than the limit of his contract, where there had been a breach of the subcontract. In fact, the *Bishop* case seems to go even further, and hold that the contract price is not the limit, even though

there has been no breach of the contract. In that case, we find the following statement:

"It is true, the respondent is seeking to recover from the subcontractor an increased price for the hauling performed *over what he would have been entitled to recover had there been no breach of the contract;* but the action is, in its essence, even as against the subcontractor, an action to recover for services performed, *and this is its entire effect in so far as the appellants now complaining are interested in it.* The respondent recovers against the bond because of the statute, which gives him the right to resort to the bond for the *value of the services rendered to a subcontractor* and for which the subcontractor does not pay. But the contract between the party performing the service and the subcontractor does not, in all cases, *fix the amount of such recovery.* It is allowed to control only *in so far as it is reasonable,* and in so far as it is a *just charge for the service performed—and the rule is the same whether the amount of the charge arises out of a breach of contract or out of performance in full at a stipulated price."* (Italics ours.)

There can be no question that, at least where there has been a breach of the subcontract, recovery may be had for the reasonable value of the services performed or material furnished, even though such amount exceeds the contract price.

■ Appellants further contend that there can be no judgment against them for delay, because the statute does not give a lien for loss of time, for mere delay, etc. We think appellants have placed a wrong interpretation on the rule. The fact that the court may use the contract price as a basis, and add thereto an additional amount caused by the breach, does not change the action, if the amount finally arrived at is the reasonable value of the services performed or material furnished. In other words, the amount cannot be segregated as so much according to the contract and so

much for delay. The amount recoverable is the reasonable value of the services or material, and for that amount the appellants are liable.

In the instant case, the trial court specifically based its judgment upon the theory that, under the facts in this case, the amount allowed respondent was the reasonable value of the services performed and the material furnished.

It remains, then, to determine whether or not there was a breach of the contract by the subcontractors.

There is ample testimony in this case to show that respondent did its work efficiently and promptly, but that, because of acts of the copartnership in failing to properly supervise the work and keep it moving along as it should have, respondent was delayed for months, and was compelled to do much of the work under conditions that greatly added to the cost. As an example, shortly after respondent started work, Arcorace left, and did not return to the work. Respondent was delayed in excavating, and then was unable to backfill because there was no pipe.

There was no coordination of the work. The general contractor would not assume responsibility, claiming the copartnership was responsible for the supervision. In fact, the record seems to indicate that no one was in charge. The city tried to get the general contractor and the copartnership to work out some plan, so that the work could move along, but this was not done, and as a result, the work dragged on through the winter, when it should have been finished by October 1st. The trial court, in its memorandum opinion, stated:

"This case fairly bristles with the acts of incompetence, inattention and arbitrary lack of cooperation on the part of Arcorace and Coluccio, which created such

a chaotic condition that the city and the general contractor, had they been fair to the subcontractors, should have early in July canceled the contract of Arcorace and Coluccio, instead of pampering them along for eight or nine months after the contract should have been completed."

We are therefore of the opinion the testimony clearly shows that the copartnership breached the contract.

■ It is next claimed the court erred in allowing interest to respondent from the date of filing its claim. We think that, clearly, under the authority of *Siler Mill Co. v. Charles Nelson Co.*, 94 Wash. 477, 162 Pac. 590, and *Halleran v. Sander*, 163 Wash. 619, 1 P. (2d) 847, the trial court was justified in allowing interest from the date respondent's claim was filed. The cases of *Fowler v. Gray*, 141 Wash. 372, 251 Pac. 570; *Brewster v. State*, 170 Wash. 422, 16 P. (2d) 813; and *Nelson v. Seattle*, 180 Wash. 1, 38 P. (2d) 1034, are not applicable on the facts.

■ It is also contended the trial court erred in admitting and considering evidence of delays as against the general contractor and its sureties, after sustaining an objection to such testimony in so far as appellants were concerned. It appears that, thereafter, appellants cross-examined witnesses in regard to this issue and introduced testimony of their own. It further appears that, after the testimony was in, counsel for appellants argued a motion to strike this testimony, and when the court refused to strike, did not request an opportunity to meet any of such evidence.

Our examination of the record convinces us that appellants were not prejudiced by the action of the court. Respondent had a right to introduce any competent evidence tending to establish the reasonable value of the work done and material furnished, and such evidence was admissible, not only against the copartnership, but also against appellants.

■ The last assignment of error is based upon the allowance to respondent of $2,500 attorney's fee. The record in this case is voluminous and indicates a great amount of work on the part of counsel for respondent, both in preparation for the trial and in the trial. The amount of the judgment was nearly thirty thousand dollars. Every item claimed by respondent was resisted. The trial court decided the sum of $2,500 was a reasonable amount to be allowed, and we agree with its conclusion.

■ There was no necessity for Queen City to give the general contractor a ten day notice. The contract was for labor to be performed, and the materials furnished were so furnished at the special instance of the general contractor, as well as the copartnership.

We shall next discuss the Bachelor and National Bank of Washington judgments.

■ Respondent National Bank of Washington has moved to strike the statement of facts, for the reason that appellants' proposed statement of facts was not served on respondent or its attorneys of record, nor was written notice of the filing thereof in the office of the clerk of the superior court served upon respondent or its attorneys.

Respondent was a defendant in the interpleader suit of appellants and intervened in the Bachelor case, claiming an interest in any judgment which might be awarded Bachelor therein, under and by virtue of an assignment to it of a portion of the indebtedness alleged to be due Bachelor. The trial court granted judgment in favor of Bachelor, and respondent's interest therein, to the amount of $1,204.90, was protected by a provision that, to the extent of $1,204.90 and interest, the judgment was for the use and benefit of the bank. From this judgment an appeal was taken by appellants. The bank was an adverse party, and

under Rem. Rev. Stat., § 389 [P. C. § 7817], Rule IX, Rules of the Supreme Court, 193 Wash. 9-a, and the rule as announced in *Hilmes v. Moon,* 168 Wash. 222, 11 P. (2d) 253, a copy of the proposed statement of facts or a written notice of the filing of such statement with the clerk of the superior court, a copy of such statement having been served on one of the adverse parties, should have been served upon it.

Appellants contend the court erred (1) in establishing a lien in favor of Bachelor; (2) in not awarding Arcorace & Coluccio judgment against Bachelor and his surety; (3) in allowing Bachelor extras and for abandoned material; (4) in refusing to allow Arcorace & Coluccio compensation for repairing Bachelor's faulty work; (5) in refusing to allow Arcorace & Coluccio compensation for doing work left undone by Bachelor; (6) in not allowing T. A. Morrey interest and attorney's fees; (7) in allowing interest on the lien in favor of Bachelor; (8) in allowing an attorney's fee of one thousand dollars.

 Did the copartnership breach its contract with respondent to such an extent as to justify him in abandoning the work, and was there substantial performance on the part of respondent?

Under his subcontract, respondent agreed to construct concrete piers on Boise creek for $3,700; concrete valve chambers at south Thirty-fifth and I streets and south Thirty-fifth and J streets, $3,050; concrete gate chamber Edison boulevard, $2,500; and J street control house, $11,745.53. The court found that, at the time respondent abandoned the work, he had furnished labor and material of the reasonable value of $6,620; that, of this amount, he had been paid $2,769; that there should be deducted, in addition to the cash received, the sum of $2,487.59, to pay claims assigned to, and paid by, T. A. Morrey, and industrial insurance paid by

the copartnership, and also the sum of $158.51, for graphite paper furnished by the copartnership.

In regard to whether or not the copartnership breached respondent's contract, much that has been said in regard to the Queen City claim might well be said in regard to Bachelor's claim. The trial court found that the copartnership was responsible for a breach of the contract in a material manner, justifying the respondent in withdrawing therefrom and in refusing to furnish labor and materials for the completion of the contract. We are of the opinion the court, under the testimony, was warranted in this conclusion.

It would be impossible and impracticable herein to attempt to review to any great extent this record of over 2,300 pages, but we refer again to the statement of the trial court that this case fairly bristles with the acts of incompetence, inattention, and arbitrary lack of cooperation on the part of Arcorace & Coluccio, which created such a chaotic condition that the city and general contractor, had they been fair to the subcontractors, should have, early in July, canceled the contract of Arcorace & Coluccio. And in this connection, we also agree with the trial court that the delays provided for in the general contract mean ordinary delays incident to the contract, and not wilful neglect of the work and arbitrary refusal to coordinate the work.

The facts, briefly stated, show that respondent is a concrete man of many years experience. After obtaining this contract, he immediately proceeded with the work. It must be kept in mind that this work was to be completed within two hundred days. There was very little of his work that could be done until the other subcontractors had done their work. The copartnership utterly failed to coordinate the work. The control house, which was the largest item in respond-

ent's contract, and on which respondent should have been able to start work immediately, was delayed because of the failure of the copartnership to get the site in condition to build on until August, and there was some testimony that it was not ready until October. Foremen on the job were changed, and no one seemed to be in charge. Respondent had to keep his crew ready, and still they were prevented from going ahead with the work. When respondent would inquire about some part of the work being in shape for him to proceed, he would be promised by Arcorace that it would be ready so that he could proceed in a week or so. This was particularly true in regard to the control house.

When he was informed the excavation was ready for the gate chamber, he found, upon investigation, that the excavation was too narrow to put in his forms. After some delay, the copartnership made further excavation, but still left the ditch too narrow, and respondent had to do some further excavation himself. Because of the delay, Mr. Parks, who had been employed by respondent to build all the forms, asked to be relieved from his contract, and respondent had to obtain other help to do this work.

Again referring to the control house, which it was contemplated would take about three or four months to build, respondent was ready to begin this work in March, and made continued inquiry as to when he could start. About August 1st, he went to the site and found it would be impossible to begin work, because the Alaska street overflow pipe was not in, or even ordered. The excavation for the building was too deep. In September, there was a meeting in the office of appellant Glens Falls Indemnity Company, in which an attempt was made to get Arcorace & Coluccio to proceed to prepare the site for the control house.

The copartnership also failed to make payment to

respondent according to the terms of the contract, and at the time respondent withdrew from the contract, he had not been paid for July or August work, and the copartnership refused to make any further payments until the job was finished, nor had he been paid for extras. Because of the failure to pay him, respondent was unable to pay parties furnishing him with material. Respondent was unable to get any adjustments for additional work which would have to be done to enable him to proceed. Because of the conditions herein mentioned, and many more of which the record is full, respondent refused to proceed further with his contract.

There is much testimony in the record relative to the condition of the work performed by respondent, appellants claiming it was not properly done, and that the city inspector refused to accept some of it. But there is also ample testimony of competent witnesses that the work was properly done, and the court so found, except for some patching and the additional work necessary to be done at Thirty-fifth and I streets and Thirty-fifth and J streets. The city accepted the work. We therefore conclude there was no breach of the contract by respondent.

We think respondent is entitled to recover herein, under our decision in *Bishop v. Ryan Const. Co.*, 106 Wash. 254, 180 Pac. 126, which case was discussed in the Queen City case.

We are also of the opinion that respondent is entitled to recover interest herein from the date of the filing of his claim. *Siler Mill Co. v. Charles Nelson Co.*, 94 Wash. 477, 162 Pac. 590; *Halleran v. Sander*, 163 Wash. 619, 1 P. (2d) 847.

The court allowed respondent an attorney's fee of one thousand dollars. The record shows that counsel herein did a great amount of work in this

case, both before and during the trial, and while an attorney's fee should be based upon the amount recovered, to some extent, at least, we feel that, under all the circumstances of this case, the amount allowed was reasonable and should be sustained.

We are of the opinion that there was no waiver by Bachelor of any of his rights herein. Appellants contend that respondent waived any delay at the control house by a letter written by him under date of September 21, 1936, to the copartnership. All the letter indicated was that respondent was willing to proceed with the work if the copartnership would perform its part of the contract and prepare the site at the control house. But, regardless of the effect of this letter, there was no waiver by Bachelor, for the reason that, at the time he abandoned the work, he had not been paid for July or August work, although the copartnership had been paid. In *Bishop v. Ryan Const. Co., supra,* we stated:

"Under the contract the respondent was entitled to be paid on the first day of May, 1917, for all of the hauling he had done in the previous month, yet the subcontractor not only refused to pay him the amount he claimed to be due, but refused to 'mutually determine' the amount due and pay him such sum as might be found due upon such determination. This was clearly a breach of the contract entitling the respondent to cancel the agreement. *That he did not do so at once, was not a waiver of the right.* The privilege was open to him at any time prior to the time the subcontractor complied or offered to comply with the agreement, and no payment or offer of payment was made until after he had served notice of his intended cancellation. Payment after that time was too late." (Italics ours.)

The copartnership having breached the contract, and there having been substantial compliance on the part of respondent, the copartnership was not entitled to

recover judgment against Bachelor for the claimed excess price paid Smith for constructing the control house after Bachelor abandoned the work, or for any other item. However, the court, in respondent's judgment, did deduct an item of $175 from the value of the completed work at Boise creek, and $1,550 from the value of the completed work at Thirty-fifth and I streets and Thirty-fifth and J streets. Appellants were entitled to nothing more.

Appellants have cited many authorities in support of the questions raised. In view of the length of this opinion, they will not be discussed other than to say that we deem them inapplicable to the facts in this case.

██ T. A. Morrey, as agent of the Glens Falls Indemnity Company, surety on the bond of Arcorace & Coluccio, intervened herein. His action was based upon certain assigned claims for labor and material furnished Arcorace & Coluccio and Bachelor. The latter admitted the claims were just, in so far as they were for labor and material furnished at his request. It is admitted the Glens Falls Indemnity Company investigated these claims, found them to be valid, and paid them. Judgment was rendered on these claims in favor of Morrey and against Arcorace & Coluccio, and the judgment was declared a lien against the retained percentage. No interest or attorney fee was allowed Morrey. No appeal was taken by Morrey from this judgment. The court, in the Bachelor judgment, deducted the amount of those claims for which Bachelor was liable and which had been paid by Morrey, as agent of Glens Falls Indemnity Company. Appellant Morrey contends the court should also have deducted interest on these claims and an attorney's fee. Clearly, we think the court was right. Morrey had not been allowed either an attorney's fee or interest in his judg-

ment, and he certainly was not entitled to an offset of more than the principal as against Bachelor.

The Frank Sussman claim was made up of the following items: Material furnished by Frank Sussman Steel Company in the amount of $210.98; material furnished by Michael Petrie in the amount of $247.87, of which $3.90 was for labor, which claim was assigned to Sussman. The court found that neither of the above claimants had given the principal contractor the statutory notice, and therefore gave judgment for $454.95 and costs against Arcorace and Coluccio only. However, the court gave judgment for $3.90, an attorney's fee of twenty-five dollars, and costs, against appellants, and declared such sum a lien against the retained percentage. Our investigation of this record convinces us that no judgment should have been given against any of the appellants other than Arcorace & Coluccio, or declared a lien against the retained percentage; nor should the attorney's fee of twenty-five dollars or the costs of $4.50 have been allowed. The judgment should, therefore, be modified, and Sussman given judgment against Arcorace & Coluccio only, for the sum of $458.85, together with costs taxed at $19, which sums shall not be a lien against the retained percentage.

The judgment in favor of Queen City Construction Company is affirmed. The judgment in favor of National Bank of Washington is affirmed. The judgment in favor of J. F. Bachelor is affirmed. The judgment in favor of Frank Sussman is modified to the extent of disallowing judgment for $3.90, twenty-five dollars attorney's fee, and $4.50 costs against appellants Pipe Co. and its sureties, and against the retained percentage; otherwise, the judgment is affirmed.

BLAKE, C. J., MAIN, STEINERT, and ROBINSON, JJ., concur.