UNITED STATES, for Use of EDWARD E.
MORGAN CO., Inc., v. MARYLAND
CASUALTY CO.
No. 861.

District Court, W. D. Louisiana, Shreveport
Division.

Feb. 18, 1944.

William H. Cox, of Jackson, Miss., for plaintiff.

Watkins & Eager, of Jackson, Miss., for defendant.

DAWKINS, District Judge.

Plaintiff sued the Maryland Casualty Company as the surety on the bond of the prime contractors, Newsom Brothers & J. W. Snowden, successful bidders on a project known as Wallace Dam, to be built across Cypress Bayou, approximately fourteen miles southwest of Shreveport, Louisiana. Complainant was the subcontractor for a portion of the said work and has demanded the sum of $26,143.16, with six per cent interest, alleged unpaid estimates, and also for the rental or use value of certain equipment, together with a "reasonable attorney's fee".

It is charged that the United States Engineer in charge had ordered plaintiff not to proceed with work on a part of said project at a time when there was only a small amount on the north side of the bayou uncompleted; that without its fault and for reasons not contemplated in or provided for by the contract, it was denied the right to complete the work south of the bayou, and was instructed not to remove its plant and equipment from said project, but to keep it intact on the job; and this was done with personnel only sufficient to prevent depreciation. Further, that plaintiff promptly complained to the said prime contractor, its surety, the defendant, and the United States Engineer, about "the unanticipated loss and special damage accruing daily * * * on account of such circumstances and conditions"; that its said plant and equipment remained "idle for the period beginning September 16, 1942 and ending October 17, 1942", and entitled the plaintiff to "recover from the defendant (the surety company) its loss as an extra and unexpected and unforseen item not contemplated by its said subcontract * * *", the sum of $17,378.25.

Further, that the contract between the prime contractor and the United States was later terminated with plaintiff's consent, and that "final settlement on said contract was effected with the prime contractors by the United States March 1st, 1943". Plaintiff alleged that the prime contractors were not made parties because they resided in the state of Mississippi and "are not to be found within the jurisdiction of this Court".

The prayer was for a total sum of $43,521.41, consisting of the aforesaid estimates and the amount claimed for the rental or use of said plant or equipment during the period of idleness alleged.

Defendant's answer pleaded payment of the estimates for the work actually performed, and, as to the demand for the rental value or use of the plant and equip-

ment, asked dismissal on the ground that no cause of action or basis for recovery was shown. Defendant further alleged that the partnership of Newsom Brothers and J. W. Snowden was doing business in Louisiana, that Snowden resides in the City of Shreveport, Louisiana, and each should be made parties hereto.

Thereafter, on September 9, 1943, defendant filed a motion for summary judgment, alleging payment of the estimates of $26,143.16 by checks, which plaintiff took to and had certified by the bank upon which they were drawn, and the amounts were charged to the prime contractors; and that the matters embraced in the remainder of the demand are not covered by defendant's bond. It prayed for summary judgment dismissing the plaintiff's petition.

On October 8, 1943, plaintiff filed an amended bill, omitting the claim for estimates and demanding the sum claimed for rent or use value of the plant and equipment, the pertinent paragraphs of which are as follows:

"The plaintiff avers that said subcontractor moved the requisite units and equipment onto said job as required by the United States for the successful prosecution and performance of said public work at the instance and request of said prime contractors thereon in accordance with the terms of said subcontract therefor. The plaintiff avers that while said subcontractor was engaged in the faithful performance of its contract, that the United States Engineer in charge of said public work ordered said subcontractor to cease all further operations and work on such project indefinitely at a time that there was only a relatively small part of said contract then not completed. The plaintiff avers that said subcontractor substantially completed all of the work to be done north of Cypress Bayou but that there was some work remaining to be done at said point which would require the use of such heavy units of equipment which can not be easily moved on account of their size and great weight. The plaintiff avers that the United States and said prime contractor impliedly agreed in fact not to interfere with or impede the subcontractor's performance of said contract, and said parties likewise impliedly agreed in fact to pay the said subcontractor the reasonable rental on said equipment for the time in question under the circumstances herein delineated. The plaintiff avers that without its fault and for reasons not contemplated in or provided for by its said subcontract, that said subcontractor was denied the right to finish said work or to remove its said plant and equipment from said project, but was required by the United States to hold and keep its said equipment and plant intact and idle on said project with sufficient personnel to prevent the loss and excessive depreciation thereof. The plaintiff avers that all work on said job was stopped and all of said subcontractor's equipment mentioned in the attached account thereof was held thereon intact and idle for the period beginning September 16, 1942, and ending October 17, 1942, and said United States Engineer refused to allow said equipment to be removed from said job under the provisions of said contract, and ordered said equipment to be kept thereat at all times under such circumstances. The plaintiff avers that said subcontractor thereby became entitled to recover from the defendant by reason of the obligation of said prime contractors' implied in fact to compensate said subcontractor for the reasonable rental value of all of said equipment at the ceiling price thereof fixed by the O.P.A. as an extra justly due it under such circumstances in the amount of $17,378.25, as will more fully appear by a verified itemized statement of said claim hereto annexed as Exhibit "D".

"The plaintiff avers that said contract between the United States and said prime contractors was later terminated with said subcontractor's consent, thereby dispensing with the necessity for the final completion of all the work originally contemplated under said contract but plaintiff avers that said contract did not thereby release the defendant from its liability on such obligation implied in fact to pay it as an extra for the rent on said equipment while it was held on said job under the terms of said contract, as aforesaid. The plaintiff avers that a final settlement on said contract was effected with the prime contractor by the United States on March 1, 1943. That plaintiff avers that more than ninety days have expired since the date of the last item in this suit for such rent justly due said subcontractor, and that no part thereof has been paid. The plaintiff avers that said subcontractor on its part duly discharged and performed each obligation by it assumed under said subcontract to entitle it to recover of the defendant on such obligation implied in fact for the reasonable rental value of said equipment for said

period of time and plaintiff avers that it has in all things duly discharged and performed each condition precedent to entitle it to institute and maintain this action."

On October 8, 1943, defendant answered the amended complaint, pleading substantially the same defense as to the demand for use or rental of machinery, and in addition, accord and satisfaction as to the amounts covered by the estimates. Thereupon plaintiff moved for a bill of particulars as to the alleged accord and satisfaction and the defendant promptly replied thereto, stating that between the 17th of October 1942 and March 8, 1943, the prime contractors had paid to the plaintiff certain sums of money representing estimates 27 to 34 inclusive, the 34th being a final estimate in the sum of $14,940.84; that upon the last check given in payment of said estimates the prime contractors wrote "in full settlement of all liability", which had the effect of discharging them from any other claim held by the plaintiff.

On December 17, defendant also filed a motion to amend its first defense contained in the answer to the amended complaint, in which it denied "that this action involves a claim for labor and materials furnished by the said subcontractor in the performance of the public work for which it has not been paid, and it is denied that jurisdiction is vested in this court under U.S. C.A. Title 40, Sec. 270b".

The matter has been submitted upon affidavits and briefs, without oral argument.

The parties have argued only the question of the idle equipment and this decision will be so confined.

It appears that there was little or no dispute as to the facts.

The court finds that Newsom Brothers & J. W. Snowden, as prime contractors, undertook construction of Wallace Dam, involving embankments both north and south of Cypress Bayou in Bossier Parish, Louisiana. They sublet a portion of the work to plaintiff, who moved upon the premises its plant and equipment in order to do the work on both sides of the Bayou. When that on the north side, which was first undertaken, was about 90 per cent complete, the Kansas City Railroad Co. raised objection to that on the south side, and this part of the work was never performed, but cancelled by the Government with the consent of both the prime and subcontractors. However, about September 16th, when the railroad had raised its ob-

jection, the engineers ordered that the work south of the Bayou be not commenced until further notice, and although plaintiff brought to their attention and to that of the prime contractors the fact that this equipment was on the job and would have to remain idle, the engineers refused to permit it to be removed for a period of a little over a month, with the consequent loss to plaintiff as claimed. In fact, there appears to be no serious dispute or contention that the amount claimed represented the fair rental value of the equipment. The only difference between the parties, it seems, is as to the legal responsibility. Counsel for the plaintiff contends that the facts created an implied debt or obligation on the part of the prime contractors, and therefore of its sureties, to pay the reasonable rental or use value, as it is termed, of this equipment, while remaining idle.

The contract between the Government and the prime contractors carries the usual provisions that the latter shall "furnish the materials and perform the work" of constructing Wallace Lake dam "in strict accordance with the specifications, schedules and drawings". Changes were authorized to be made on the written order of the contracting officer "without notice to the sureties * * * within the general scope" of the contract and if there was any increase or decrease in the amount due "or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly". Claims for such adjustment were required to be made within ten days from the date the change was ordered, except that, in the discretion of the contracting officer, they might be adjusted at any time prior to the date of final settlement of the contract.

With respect to extras, Article 5 of the contract provides:

"Article 5. Extras.—Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order."

Article 15 deals with disputes (between the prime contractors and the Government) as follows:

"Article 15. Disputes.—Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written

appeal by the contractor within 30 days to the head of the department concurred or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed."

While there is no specific provision permitting the subcontracting of the work, and it is conceded that under the statute the contract can not be assigned, reference is made to subcontractors in Article 6(c) and Article 19(c), which, in addition to the ordinary practice of subletting, discloses that it was contemplated here. However, the position taken by the contracting officer or engineer of the work was that the plaintiff had no contractural relations with the Government and had to deal directly with the prime contractors. It was therefore impossible for plaintiff to make any adjustment of the matter, in view of the threats of the engineers to resort to court action, and it was compelled to keep its equipment on the project until permitted to remove it. In this situation there was nothing it could do and the question is as to whether, in these circumstances, any liability arose for which the surety on the prime contractors' bond could be held. The rights of the plaintiff against the prime contractors and the Government, over and above any responsibility of the surety company, are not involved.

■ While the defendant surety company is the moving party in the motion for summary judgment and therefore has the burden of establishing its negative defense, it seems appropriate to consider the law first from the standpoint of plaintiff.

The bond sued on is in the usual form and the clause containing the obligations of the surety company is substantially in the language of the statute and reads as follows:

"Now therefore, If the Principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said contract, and any and all duly authorized modifications of said contract that may hereafter be made, notice of which modifications to the surety being hereby waived, then this obligation to be void; otherwise to remain in full force and virtue."

■ The courts have construed liberally this and similar statutes, as well as the contracts and bonds made thereunder, to the end of accomplishing their purpose of protecting those who perform labor and furnish materials for such public work. Plaintiff contends that it is not necessary that the labor and materials furnished be actually used or consumed in the erection of the structure itself. Many cases hold that work performed at other points, supplies of food and quarters to laborers, transportation of materials, etc., come within the definition of labor and materials furnished for which the bondsman can be made to respond.

Both sides have cited many authorities. Plaintiff has quoted from Corpus Juris, Vol. 13, pp. 243, 558, 559 and § 721, 17 C.J.S., Contracts, §§ 5, 328, 468, stating the general principles that there can be no implied obligation where the contract is specific, but that this does not apply where the liability asserted is "based on the subsequent conduct of the parties not covered by the express contract"; that a contract "includes not only what is expressly stated but also what is necessarily to be implied from the language used, etc."; and that "each party to a contract impliedly agrees not to prevent the other party from performing or to render performance impossible by any act of his own * * *". Similar quotations are made from 12 Am.Juris. Sec. 239 p. 767. .

■ Every contract, legally made by the parties, is presumed to have been in good faith, and with the purpose of having all its provisions performed with the benefits to each flowing therefrom. Any serious breach by either side entitles the other to redress in the manner, if not specifically covered, governed by well settled principles. If this had been a simple original contract between private persons, there could be no question about plaintiff's right to call the other contracting party (Newsom Bros. & J. W. Snowden) to account for the breach, if it had, for any reason of its own, caused the injury or damage resulting from inability to use or remove the identical equipment from the premises. The very purpose of placing it on the project was to perform the work undertaken, including that south of the Bayou, and the fact that the latter was subsequently eliminated by agreement would not have excused the act of requiring it to be thus kept in idleness for the period complained of. Here, however, the prime contractor, it may be assumed, was not consulted nor did it have any control over the action of the engineers save such as its own contract

which the Government gave it. At the same time, the Government refused to recognize the subcontractor in the sense of dealing with it or permitting it to assert any rights under the primary contract, notwithstanding it was required to submit to the control of the equipment by that authority, by virtue of the original contract. While it is true, in a certain sense, that the plaintiff was an independent contractor and there was no direct agreement between it and the United States, yet, if it was contemplated that the work might be sublet, which was clearly the case by the terms of the contract, the latter could not for these reasons commit an unauthorized breach to the injury of the subcontractor any more than it could against the prime contractor. If its (the government's) action had the effect of preventing the prime contractor from carrying out the terms of the contract and the latter had thereby become liable to plaintiff, then it is hard to see why the primary contractor should not have the right to assert its claim or be reimbursed for any outlay thus made, depending, of course, on the terms of the original contract. These are principles which I think may be assumed.

We come to the legal relation of the surety to such a situation. It must be kept in mind that the obligation of the bond did not run in favor of the prime contractors, but was given by them for the protection both of the Government and persons, including subcontractors, who might furnish materials or perform labor in carrying out of the original undertaking. In other words, if the Government, without justification, refused to pay the contract price, the prime contractors would have no claim against their own bondsmen. This, however, was not true as to the subcontractor; it, like any other furnisher of labor and material, came within the protection of the bond.

In the first case cited by plaintiff, Royal Indemnity Co. v. Woodbury Granite Co., 69 App.D.C. 364, 101 F.2d 689, while the court used the rather broad language quoted, in reality all that was involved was the point as to whether the claimants could recover the stipulated value of the stone furnished, although there was proof that the price was greater than had been paid in other instances. It was held that, in the absence of collusion, or proof that the lesser figure was the price of the stone at the time the contract was made, its provisions would control, and the bondsmen

would have to respond accordingly. In Merrill Engineering Co. v. United States, D.C., 47 F.2d 932, the manner of laying a sidewalk, after it was started, was changed by the city, as it had a right to do under the contract, and recovery for the increased cost, as against the bond, was allowed under the heading of an extra. United States v. North American Transportation & Trading Co., 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935, held that the Government was bound to pay the fair market value of real property "appropriated" as distinguished from a taking by condemnation proceedings. This was but the simple application of the terms of the Federal Constitution.

The court has not been able to examine the citations from the Court of Claims, for it does not have this work in its own library nor has it been able to find it in Monroe. However, it was able to find the case of United States v. Peck, 26 L.Ed. 46, from its tables of the U.S. Report (Of. Ed.), reported in 102 U.S. 64. Peck contracted with the Government to furnish the army wood and hay. He furnished the wood but not the hay, and when payment was sought, the accounting officer had charged him with the difference between the contract price and a higher figure paid to others. It was held that the contract had been made in the light of circumstances well known to both sides surrounding the furnishing of the hay near the place where it was to be delivered. Fearing that Peck would not be able to carry out his contract, and without giving him a chance to do so, the Government hired other persons to cut the same hay for a higher price. The court decided he could not thus be deprived of the possibility of performing his contract and at the same time charged with the greater price. He was allowed to recover under his contract for the price of the wood. Owen v. United States, 44 Ct.Cl. 440 seems to have been cited mainly for the quotation therein from Dermott v. Jones, 2 Wall. 1, 17 L.Ed. 762, which latter case is in the court's library, to the effect that "if, by the fault of the defendant, the cost of the work or materials has been increased, in so far the jury will be warranted in departing from the contract prices." This was a case in which the terms of the contract for erecting a house were so clear and positive that after the contractor had erected the structure upon an unstable foundation, it became necessary, because of the nature of the soil to tear it down and to replace it on proper

foundation, which the owner did, the contractor having refused, and the latter was held responsible for the additional cost.

It is not deemed necessary to analyze some of the other cases cited. Following the cited Court of Claims cases, counsel for plaintiff says: "The United States owed the prime contractor extra for this increased expense visited upon the plaintiff" and that the Court of Claims has held that "whether or not such expense is allowable * * * is always a question of fact". We are unable, for the reasons stated, to consider the circumstances of Ross Engineering Co. v. United States, 92 Ct.Cl. 253, but in the present case all the material facts appear to be undisputed. Counsel for plaintiff next cites a number of decisions holding the bondsmen liable for groceries, housing expenses, board for employees, freight bills, etc., as for labor and materials within the meaning of the statute, such as Brogan v. National Surety Co., 246 U.S. 257, 38 S.Ct. 250, 62 L.Ed. 703, L.R.A. 1918 D, 776; and Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S.Ct. 614, 617, 61 L.Ed. 1206, and others. In the Davis case the surety was held liable for rental of cars, expenses of loading, etc., as "material * * * supplied * * * [and] the expense of loading of freight was properly included with the fixed rental as recoverable under the bond." That suit was under the Heard Act, 40 U.S.C.A. § 270, and like the other cases, it was found that the items furnished formed a part of the expense of performing the contract.

In Maryland Casualty Co. v. City of Tacoma, 199 Wash. 72, 90 P.2d 226, 94 P.2d 217, 749, 123 A.L.R. 399, 1521, work was being done on what was known as a "PWA project" with funds furnished by the Government. The surety filed an interpleader and deposited the funds in the state court. Many issues were raised as to fraud on the part of some of the parties to the contract, breach of contract by others, etc., but the trial court found, and this was affirmed by the Supreme Court of Washington, that the claim was for the reasonable value of service performed and of materials furnished. It was found that the contractor had breached the contract and the claimants were entitled to recover the additional reasonable cost of doing the work. United States v. Behan, 110 U.S. 338, 4 S.Ct. 81, 28 L.Ed. 168, was not a suit against but by a bondsman, which had taken over the contract for completion. The Government abandoned further prosecution of the work and recovery was allowed against it. In Bishop v. T. Ryan Const. Co., 106 Wash. 254, 180 P. 126, 130, the contract and bond were executed under a state statute, and the bondsman was held liable for labor and materials. The claimant sued for work under a subcontract and also for amounts stipulated in said contract in event he was compelled to cancel it under certain conditions. It was cancelled and claim made both for services performed and for the penalties or profits. In disposing of the matter the court said:

"The final contention under this head is that the action is one to recover liquidated damages or a penalty, and as such is not chargeable against the bond. It is true the respondent is seeking to recover from the subcontractor an increased price for the hauling performed over what he would have been entitled to recover, had there been no breach of the contract; but the action is in its essence, even as against the subcontractor, an action to recover for services performed, and this is its entire effect in so far as the appellants now complaining are interested in it. The respondent recovers against the bond because of the statute, which gives him the right to resort to the bond for the value of the services rendered to a subcontractor and for which the subcontractor does not pay."

Thus, it was found by the Washington Supreme Court that under the terms of the bond furnished as provided by the statute, in connection with the principal contract, items of the account sued for were recoverable, on the basis, not necessarily of the stipulated amount, but of their reasonable value. Ballenger Const. Co. v. Joe F. Walters Const. Co., 236 Ala. 548, 184 So. 275, 277, was a suit on a contract for the removal of the top soil on a plot of ground, and the contract was breached after only a portion had been removed. The court held:

"The chief contention is as to count 1. This count claims an amount due for rental of a certain Lorain shovel for the months of July, August, September, October, and November 1934. The opinion recites that in support of this claim plaintiff offered testimony that the contractor rented it to 'move all a certain described lot of sand clay top soil. It (plaintiff) admits that it was paid in full for all said sand clay top soil which it actually moved.'

"The theory on which the Court of Appeals acted is that the balance now sued for

is virtually but damages which plaintiff claims by reason of a breach of the contract to move all the said sand and gravel and pay for it by the yardage. The contract may be what the opinion declares it to be and still in substance be that appellee rented the shovel to move a certain lot of soil, and that the compensation was to be measured by the yardage of the whole lot. In that event, the agreement would not be to move such part of it with this shovel as appellee chose and to pay only for the yards that it did move with the privilege of using another shovel for the balance. *If he rented the shovel of plaintiff under such circumstances that when properly interpreted, the compensation should be measured by the amount of soil in the lot to be moved, he could not avoid payment of such full amount so agreed on by using it only for a part, if it may be definitely shown what was the amount of yardage in the lot agreed on.*

"It is plaintiff's contention that his contract is exactly that. If so, he should not be cut off from asserting it by rendering a final judgment for the failure to allege and prove that the suit was begun in due time and under the circumstances here shown.

"No one now contends that the rental of such appliance is not within the obligation of such a bond. United States F. & G. Co. v. Yeilding Bros. Co. Dept. Stores, supra [225 Ala. 307], see page 316, 143 So. [176], page 183(31); United States F. & G. Co. v. R. S. Armstrong Bro., 225 Ala. 276, 142 So. 576(7); Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206."

It is thus seen from the portion of the quoted language italicized that the claim was for rental due by the subcontractor to the owner of the machines for the price agreed to be paid and that the failure to use it for the entire job did not relieve the liability for its rental any more than the obligation to pay for lumber or other materials furnished would be destroyed by the use of the same on some project other than that covered by the contract and bond.

Turning now to the authorities cited by counsel for defendant quotation is first made from paragraph 1–14 of the specifications under the heading "Organization Plan and Progress" that "no change in the plant employed on the work which would have the effect of decreasing its capacity below the capacity named in the bid, shall be made, except by written permission of the contracting officer" as authorizing the course pursued by the engineer in not permitting the plant and equipment of the plaintiff to be removed. Other provisions of the specifications are cited as giving wide authority to the contracting officer. But it would seem that this authority and restriction upon the prime contractor, which were equally applicable to the subcontractor, contemplated the continuous, uninterrupted and ultimate completion of the contract. It clearly did not envisage a situation where because of some unexpected development that officer would, in effect, sequester the equipment in a state of idleness, with consequent great loss to the claimant. United States for Use of Spencer v. Massachusetts Bonding Co., 6 Cir., 18 F.2d 203, was cited to the point that the bondsman's liability is measured by the statute, 40 U.S.C.A. § 270a–270d; Babcock & Wilcox v. American Surety Co., 8 Cir., 236 F. 340, that it will not be extended beyond the terms of the bond; Hardaway v. National Surety Co., 211 U.S. 552, 29 S.Ct. 202, 53 L.Ed. 321 that the assignee of a claimant for labor and materials can not recover the wages of a superintendent placed upon the job to supervise the work for the assignee's protection; and to the same effect Eberhart v. United States, 8 Cir., 204 F. 884; United States to Use of Sica v. Kimpland, C.C., 93 F. 403; United States ex rel. Southern G-F Co. v. Landis & Young, D. C., 16 F.Supp. 832, 833, by this court, holding that premiums on the bond could not be recovered; United States v. Hercules, D.C., 52 F.2d 454, by Judge Holmes in the Southern District of Mississippi, that the surety could not be made to pay the extraordinary expenses of moving a lot of heavy machinery by barge over a great distance from the point where it was located to the site of the work; United States for Use of Carnegie Institute of Technology v. C. A. Riffle Co., D.C., 247 F. 374, that damage to the property of third persons caused by the contractor during construction could not be recovered from the surety; American Surety Co. v. Wheeling Construction Steel Co., 4 Cir., 114 F.2d 237, denying recovery against the surety for damage flowing from the wrongful withholding of payments for labor and materials; and United States for Use and Benefit of Davies v. Blauner Construction Co., D.C., 37 F.Supp. 968, 970, holding that recovery as an extra could not be had

against the surety for unforseen expenses in removing rock. In the last mentioned case, the subcontractor obtained the work of installing certain plumbing at a fixed price, which required excavation under the building. In the course of an extended finding of facts the court concluded that the claimant had as good an opportunity as anyone else to discover the condition which existed, and that failure to do so was due to his own negligence; that bids had been made and accepted by the Government under the conditions with which the bidders were familiar, and this unexpected expenditure could not be taxed against the Government or the surety on the bond, even though the superintendent of the principal contractor might have agreed, during the progress of the work, that it could be treated as an extra. The court said it found that "it was the understanding of the plaintiff (claimant) that he was to remove whatever rock or other material that was encountered by him in excavating for the job" and cited other cases to the point that "a contract for excavation will generally not be excused because the character of the soil or rock is more troublesome than was anticipated." No such element is involved here. The plaintiff in the present case could not foresee that the Government engineer would pursue the course which he followed. In United States for Use of Helie v. Great American Indemnity Co., D.C., 30 F.Supp. 613, it was held that the claimant should not recover a profit on extra work not contemplated in the contract, but only for the value of the extra labor and material.

Defendant next cites the case of Friestedt Co. v. United States Fireproofing Co., 10 Cir., 125 F.2d 1010, 1011. In this case the suit was by the Government for the use of certain claimants on a contract and bond given under the Heard Act. 40 U.S.C.A. § 270, for the construction of an addition to the customhouse in Denver, Colorado. It was alleged that the original contract required the work to be completed within a fixed period, but delays caused by the principal contractor "in completing the preliminary work necessary to be done first plaintiff (subcontractor) was delayed in his work" and incurred "additional expense for labor and material". Friestedt Co., one of the subcontractors, charged that it had agreed to erect the structural steel at a price of $15.50 per ton but that because of the delays and condition of the building, it was compelled to "hoist all the steel by hand and was also required to rent additional equipment" by which it was damaged to the extent of $6732.49, for which it prayed judgment against the contractor as principal and the surety on its performance bond. The trial court having sustained a motion to dismiss the claim, the court of appeals affirmed the ruling and we quote in part therefrom as follows:

"Stripped of all technicality, plaintiff and intervenor seek to recover damages claimed to have been incurred because of the breach by the contractor of an implied covenant in the sub-contract against unreasonable delays preventing the subcontractors from proceeding with their work. The parties recognize this, because in the only point relied upon in their designation of points, it is asserted that: '* * * a subcontractor can recover his damages consisting of expenses made necessary by the delay of the principal contractor in a proceeding to recover on the bond under the Heard Act, 40 U.S.Code, Sec. 270.' They cite numerous authorities to sustain their position that every contract contains an implied warranty against unnecessary delays and that recovery may be had for loss resulting from a breach thereof. These decisions are beside the point, because they arose in actions against the contractor for damages and not against the surety on a Heard Act bond.

"The bond on which the action is based is not set out in the abstract, but we may assume that it is in due form and conforms to the requirements of the Act. The Act obligates the surety company to see that the contractor 'shall promptly make payments to all persons supplying him or them with labor and materials in the prosecution of the work provided for in such contract.' It requires payment not only of work and materials specifically mentioned in the contract, but also those items which the parties necessarily and reasonably contemplated as being required for the performance of the contract. It has been held that where the work was so remotely located that the contractor had to board his employees, groceries furnished the contractor and consumed by his workers were within the contemplation of the parties as materials necessarily furnished under the contract. Brogan v. National Surety Co., 246 U.S. 257, 38 S.Ct. 250, 62 L.Ed. 703, L.R.A. 1918D, 776. In Title Guaranty & Trust Co. v. Crane Co., 219 U.S. 24, 31 S.Ct. 140, 55 L.Ed. 72, recovery was allowed not only for cartage and towage of materials, but

also for drawings and patterns used by the contractor in making molds for casings which entered into the construction of the ship. In United States Fidelity & Guaranty Co. v. United States, for Benefit of Bartlett, 231 U.S. 237, 34 S.Ct. 88, 58 L.Ed. 200, where the work contracted for was building a breakwater, recovery was allowed for all labor * * * not only of the men who stripped the earth to get at the stone and who removed the debris, but carpenters and blacksmiths who repaired the cars in which the stones were carried to the quarry dock for shipment, and to repair the tracks upon which the cars moved. The claims allowed also included the wages of stablemen who fed and drove the horses which moved the cars on these tracks. In Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206, recovery was allowed not only for the rental of cars, track and other equipment used by the contractors in facilitating the work, but also the expense of loading this equipment and freight in order to transport it to the place where it was used. In each of these cases the Act was liberally construed to protect those furnishing labor and material that went into the construction covered by the contract. It is to be noted, however, that in every instance recovery was allowed on the bond because the outlays for which recovery was sought were necessary for the performance of the contract and were within the contemplation of the parties to the contract.

"Here the contract required plaintiff and intervenor to furnish labor and material and perfect certain constructions. They performed their part of the agreement and received their agreed compensation provided for in the contract. There is here no claim that they furnished any extras necessary for the completion of the contract and therefore contemplated by the parties and implied in the contract. The claim for which the parties seek recovery here did not arise under the contract, but outside of the contract. What was done was not required by any of the terms of the contract but became necessary because of an alleged breach of the contract because a contractor violated one of the terms of the contract; in other words, committed a wrong against the parties resulting in loss or damage to them.

"We know of no case that has gone so far as to hold that one may recover damages for breach of a contract on a bond required under the Heard Act. The only case deciding this precise question has held to the contrary. See United States [to Use of Watsabaugh & Co.] v. Seaboard Surety Co., D.C.Mont., 26 F.Supp. 681. We fail to discern anything in the Heard Act evidencing a Congressional intent to protect one under the bond required by the Act against damages resulting from breach of contract. Had such been the Congressional intent, it no doubt would have been evidenced by appropriate language."

■ We are unable to distinguish in principle the present from the Friestedt case. While the plaintiff calls its demand one for the rental or the use value of its equipment, it is in reality for the damage caused by keeping the equipment idle in compliance with the orders of the Government engineer—in other words, for a breach of the implied obligation that it would be permitted to perform without interference. It is not a claim for money paid to others for the rental of the machinery, as was true in some of the cases cited, but for what it lost, because of its inability to use or remove the equipment. Whether or not, in an appropriate action for what was paid to the owners of the machinery as rental, it could recover, is not a matter which can be decided in the present state of this case.

The conclusion is that the nature of the demand is such that it does not disclose a right to recover against the surety for labor and materials furnished under the statute and bond given pursuant thereto.

Proper decree should be entered.