[No. 20428. *En Banc.* June 8, 1928.]

## PUGET SOUND BRIDGE & DREDGING COMPANY, *Appellant,* v. JAHN & BRESSI *et al., Respondents.*[1]

[1] MUNICIPAL CORPORATIONS (180)—PUBLIC WORKS—RIGHTS AND REMEDIES OF CONTRACTORS—CONTRACT—PRICE OF EXCAVATION. The evidence sustains findings that a subcontract for excavation fixed the price at $2.49 per cubic yard, where the contract referred to a graph, showing a sliding scale, at which the quantity excavated would come to at least $3.65 per cubic yard.

[2] REFORMATION OF INSTRUMENTS (20)—EVIDENCE—SUFFICIENCY. A written contract for excavation will not be reformed on conflicting evidence where the affirmative is not supported by clear and convincing evidence.

[3] MUNICIPAL CORPORATIONS (159)—PUBLIC IMPROVEMENTS—CONTRACTOR'S BONDS—LIABILITY OF SURETIES—REASONABLE VALUE OF SUBCONTRACTOR'S SERVICES. A subcontractor on public work cannot recover from the principal contractor's bondsman in excess of the reasonable value of the services.

[4] SAME (159). A finding that the reasonable value of excavation by a subcontractor on public work, in an action against the principal contractor's bondsman, was less than the contract price, is sustained, where it appears that, of the 60% of the material removed, the larger part was silt and the other hardpan, and the subcontractor's estimates of the cost of the unfinished work tended to support the finding.

[5] SAME (159-1)—CONTRACTORS' BONDS—NOTICE OF CLAIM—TIME FOR FILING. Rem. Comp. Stat., § 1161, providing for the protection of laborers and materialmen by a contractor's bond on public work, upon their filing a claim within thirty days after "com-

[1]Reported in 268 Pac. 169.

pletion of the contract with an acceptance of the work", refers to the final completion of the contract by the city or the sureties, and not to the time when the contractor abandons the work or is discharged for non-performance; and, at least, the claim is timely when filed within a reasonable time and before the adjustment of the differences between the city and the contractor when no prejudice resulted to the bondsman.

[6] SAME (159)—CONTRACTORS' BONDS—CLAIMS OF CITY—LIABILITY OF SURETY. Where, on default of a contractor on public work, the city took over the performance and paid the contractor sums, without showing that the contractor applied the same on items chargeable against the bond, it cannot file claims against the bond for a balance due from the contractor to the city for electric energy and water furnished to the contractor under the contract.

MAIN, J., dissents in part.

Appeals from a judgment of the superior court for King county, Stern, J., entered July 27, 1926, upon findings in favor of the defendants Jahn & Bressi and City of Seattle in an action on contract, tried to the court. Affirmed in part and reversed in part.

*Roberts & Skeel* and *D. D. Mote,* for appellant Puget Sound Bridge & Dredging Co.

*Preston, Thorgrimson & Turner,* for appellant United States Fidelity & Guaranty Co.

*Wright & Catlett* and *Edwin C. Ewing,* for respondents Jahn & Bressi.

*Thomas J. L. Kennedy* and *J. Ambler Newton,* for respondent City of Seattle.

*Battle, Hulbert & Helsell,* for respondent Moran Manufacturing Co.

FULLERTON, C. J.—Sometime prior to the year 1923, the city of Seattle, by ordinance, provided for additions to its municipally owned water supply system. A part of the plan contemplated taking water from an inland lake, some sixteen miles distant from the city, known as Lake Youngs. On November 6, 1923, the

city prepared plans and specifications for the addition, and called for bids for its construction. Nicholas F. Jahn and Vincent Bressi, co-partners as Jahn & Bressi, were the successful bidders therefor, and, on February 13, 1924, a contract for the construction of the addition was awarded to them. At the time of the execution of the contract, they gave a bond to the city, with the United States Fidelity & Guaranty Company, as surety, in the sum of $500,000, conditioned according to the requirements of the statute applicable in such cases. The contractors entered on the actual prosecution of the work in April, 1924. On April 3, 1925, they sublet a part of it to the Puget Sound Bridge & Dredging Company, who shortly thereafter entered upon its performance. Both the original contractor and the subcontractor continued in the work until August 21, 1925. Prior thereto differences had arisen over the performance of the work between the contractors and the city, which, becoming acute on that day, resulted in a notice from the contractors to the city to the effect that they had ceased work because of a breach of the contract on the part of the city, and a notice from the city to the contractors directing them to cease work because of a breach of the contract on their part. The subcontractor, at the solicitation of the bondsman, continued work on its subcontract until September 4 thereafter, when it ceased at the direction of the city. The city subsequently let the unfinished part of the work to one J. M. Clapp, who completed it to the satisfaction of the city on April 9, 1926.

The work called for by the original contract was of considerable magnitude. It required the construction of a concrete lined tunnel conduit, eight feet in internal diameter and approximately 8,000 feet in

length, leading from the margin of the lake mentioned, through the highlands surrounding it to a connection with the city's established reservoirs. The intake was six hundred feet out into the waters of the lake from the mouth of the tunnel conduit, and its insertion required excavation from the bottom of the lake for a considerable space surrounding it, and also required the excavation of a channel for the insertion of a water conduit, leading from the intake to the tunnel conduit. The excavation for the first of these purposes was denominated "Item 1" on the city's specifications, and the quantity of material to be excavated was estimated at 20,000 cubic yards. The second was denominated "Item 5," with an estimated quantity of material to be excavated of 7,500 cubic yards.

The principal contract was largely performed by Jahn & Bressi. The contract between them and the city of Seattle is what is commonly known as a unit price contract. By its terms, they were to be paid according to the quantity of material removed, the payments to cover the entire cost of the work. It was provided that they were to be paid for the work on monthly estimates to be made by the city's engineers, as the work progressed, less a fixed percentage to be retained by the city until the completion and acceptance of the work. For the work performed they were paid on estimated quantities of the work completed, less the retained percentage, to the end of June, 1925. The amount paid was $1,176,095.49. The amount of the reserve at that time was $127,609.57. Between June 30, 1925, and the termination of the contract, they had earned, according to estimates of the city engineer, an additional sum of $19,614.98. The contractors had, during the progress of the work, incurred a number of obligations for supplies and materials in addition to the work performed under the subcon-

tract, and the holders of the obligations, shortly after the cessation of the work by the principal contractors, filed claims against their bondsman. The subcontractor also filed such a claim. The claims so filed aggregated $189,821.66.

In this action, the subcontractor sought to recover against Jahn & Bressi and their bondsman for the work performed under their subcontract. It made parties defendant to the action all of the claimants who had filed claims against the bond. The claimants appeared in the action and set up their respective claims and sought judgment thereon against Jahn & Bressi and the bondsman. Jahn & Bressi and the bondsman took issue upon the amount of the claim of the subcontractor, and the bondsman took issue on many of the claims filed against its bond, contending, as to a part of them, that they were not timely filed, and as to others, that they contained non-lienable items, or, perhaps more accurately, contained items not chargeable against the bond. The trial court, with commendable patience and painstaking care, heard and determined the issues, and entered a judgment from which only the subcontractor and the bondsman appeal.

To an understanding of the questions raised by the appeal of the subcontractor, some further statement of the facts is necessary. That company undertook to do the excavation surrounding the intake to be constructed in the lake, and the excavation necessary to permit the laying of the water conduit reaching from the intake to the tunnel conduit hereinbefore mentioned; the work being that required by item 1 and item 5 of the city's specifications. The contract is in the form of letters addressed to Jahn & Bressi by the dredging company. The first of the letters reads as follows:

"Messrs. Jahn & Bressi,      "March 27th, 1925.
"L. C. Smith Building,
"Seattle, Washington.
"Gentlemen:

"Referring to dredging in Youngs Lake:

"This is to advise that we have looked over this work, and will undertake it on the following terms:

"(1)   Dredging at intake, outside of Station 6, as shown on profile, to comply with the city specifications, Thirty-four Thousand Six Hundred Eighty-four Dollars ($34,684.00) lump sum;

"(2)   Excavation for outlet conduit, lake section, between stations 12 and 6, One and 57/100 Dollars ($1.57) per cubic yard; we to be paid for actual quantities removed, and you to have the privilege of stopping work at any time that it seems to your best interest to do so. We, on our part, shall excavate as closely as possible to the required section; but, as noted above, shall expect payment for all material removed.

"The level of the water in the lake will govern in part, the limits of our dredging operations between Station 6 and Station 12.

"In addition to the price quoted, you are to furnish free power, delivered at the site, and free transportation to and from the work for our plant and supplies. You are to provide accommodations for as many as ten men at your camp at a rate for board and room of not to exceed $40.00 per month.

"The above price does not include any back fill; nor does it contemplate our furnishing surety bond. Our quotation is based on the expectation that we can make mutually satisfactory financial arrangements.

"We thank you for the opportunity to quote on this work. Kindly let us know as early as possible what your wishes are in the matter.

"Very truly yours,
"Puget Sound Bridge & Dredging Co.
"By Roy E. Miller."

The proposition made was not satisfactory to Jahn & Bressi. They objected to the lump sum bid on item

1, desiring a quantitative bid. They objected also to the provision requiring them to furnish free power and free transportation for materials and supplies to and from the work, desiring that the cost thereof be borne by the subcontractor and included in the unit bid. The company thereupon addressed to them a second letter reading as follows:

"Messrs. Jahn & Bressi,         "April 3rd, 1925.
"L. C. Smith Building,
"Seattle, Washington.
"Gentlemen:

"Referring to our letter of March 27th and conversation on April 1st regarding dredging in Youngs Lake:

"Item 1.

"In lieu of our lump sum price of $34,648.00, we are handing you herewith a graph from which can be taken off our unit price bid per cubic yard of material excavated outside of Station 6; or 6 plus 30 as shown on plans said unit price being governed by the total quantity actually excavated as allowed by the city in its estimate to you for this work.

"We have adjusted our price to meet your request that you be relieved of the requirement of furnishing free power delivered to the site and free transportation to and from the work for our plant and supplies. We are asking, however, that you furnish to the city, without cost to us, whatever extension is necessary to your present power line to reach our job, including the setting up of the transformers. We are asking this because it is a small item, and, so far we have not been able to arrive at it definitely. Further, while our work will be separately metered, the power charge will be billed to you and we will reimburse you in a like amount.

"Item 2.

"This we have changed from $1.57 to $1.76 to take care of power charge and hauling cost; otherwise this item stands as of March 27th.

"It is mutually understood that we are to receive on each estimate date the amount that the city pays

you in its progress estimate for the work in question, and that upon the first estimate date following the completion of our work we shall receive payment in full, including retained percentages, regardless of whether you have received a like amount from the city.

"In other particulars our letter of March 27th shall govern.

"Please acknowledge your acceptance below and return one copy of our files; also please place your signature on each of the graphs enclosed herewith, and we shall do likewise.

"Very truly yours,

"PUGET SOUND BRIDGE & DREDGING Co.

"By Roy E. Miller."

On the letter, Jahn & Bressi endorsed their acceptance, and placed their signatures on each of the copies of the graph mentioned as enclosed with the letter. The graph is substantially reproduced and attached as an appendix to this opinion.

The trial court found that the subcontractor had excavated 9,764.5 cubic yards of material under item 1 of the principal contract, and 1,388.4 cubic yards under item 5. The parties have accepted these findings to be correct, and there is, in consequence, no dispute among them as to quantities. There is likewise no dispute in this court over the amount recoverable by the subcontractor against Jahn & Bressi and the bondsman for excavation under item 5. The contract definitely fixed the price per cubic yard for excavation under this item, and the trial court found, and the bondsman does not dispute, that the contract price was the reasonable value of the services.

The dispute is over the amount recoverable under item 1 of the contract. The trial court found that the price fixed by the subcontract for excavation under this item was $2.49 per cubic yard, found further that this price was the reasonable value of the services, and

entered a judgment against Jahn & Bressi and the bondsman calculated at that rate. The subcontractor contends that the contract fixes a rate of $3.65 per cubic yard, and that it is entitled to recover against Jahn & Bressi and the bondsman at that rate. Jahn & Bressi, on the other hand, contend first, that the court correctly interpreted the contract, and second, that if it did not, then the contract does not express the actual agreement entered into between the parties, and that they are entitled to have it reformed so as to express the actual contract. The bondsman contends that its liability to the subcontractor is not necessarily measured by the contract between the subcontractor and Jahn & Bressi; that it is liable only for the reasonable value of the services performed by the subcontractor under its contract, and that the reasonable value of the services does not exceed that found by the court.

[1]    Noticing first the contentions between the subcontractor and Jahn & Bressi, we are constrained to the view that the subcontractor's interpretation of the contract is correct. Plainly, we think, the contract, interpreted in the light of the graph, fixes a maximum rate of ten dollars per cubic yard for all material excavated, if the quantity is 3,000 cubic yards or less, and a minimum price of one dollar per cubic yard, if the quantity excavated is 40,000 cubic yards or more, with a sliding scale of prices between the two quantities, decreasing from ten dollars to one dollar per cubic yard as the quantity excavated increases. The scale on which the graph is drawn is too small to admit of an exact determination, but we do not understand that the parties differ over the amount claimed as recoverable, if the contract is to be given effect as written. But that the question may be set at rest, we here say that, as we view the original graphs, the price

of $3.65 per cubic yard is rather under than over the permissible charge.

[2]   The claim that the contract as written does not represent the true contract entered into between the parties, we shall not discuss at length.  It is supported in some degree by the testimony of Jahn who represented his firm in the execution of the contract, but it is denied by the representatives of the other party thereto.  There is not much in the circumstances surrounding the transaction that seems to lend aid to the version of either party, and we are not convinced that the affirmative of the issue is supported by that clear and convincing evidence necessary to vary or modify the agreement the parties put in writing.

[3]   On the question in dispute between the subcontractor and the bondsman, we do not understand that the subcontractor contends that it may recover in excess of the reasonable value of the services.   If it does so, however, its contention is contrary to the settled doctrine of this court.   Our rule is that, as against the bondsman of the principal contractor, a subcontractor performing services, or a materialman furnishing materials, can not recover in excess of the reasonable value of the services performed or the reasonable value of the materials furnished.   *Kongsbach v. Casey,* 66 Wash. 643, 120 Pac. 108; *Crowe & Co. v. Adkinson Const. Co.,* 67 Wash. 420, 121 Pac. 841; *Hambach v. Ward,* 69 Wash. 351, 125 Pac. 140; *State Bank of Seattle v. Ruthe,* 90 Wash. 636, 156 Pac. 540; *Old National Bank v. Lewis County,* 137 Wash. 436, 242 Pac. 961.

[4]   The subcontractor strenuously argues that the price it contends the contract fixes is the reasonable value of the services.  It points out that the work was performed upon an inland lake; that the dredging was under water; that a dredger had to be constructed at

the place, out of material carried there for the purpose; that scows to carry away the excavated material had to be constructed; that it was a small job and that the expense must necessarily be greater proportionally than it would be had the work been extensive; and it points to the price the principal contractors were willing to pay for the work as evidence of its reasonable value.

These are matters unquestionably which may properly be taken into consideration in determining the reasonable value of the services performed, and were they the whole of the circumstances, possibly there would be no just reason for saying that the contract price was not the reasonable price. But there was persuasive evidence supporting the conclusion of the trial court to the contrary. The subcontractor excavated about sixty per cent of the material necessary to be so excavated. The material was of two characters. There was a top layer of silt, which could be removed by the simple process of dredging, while the remainder was hardpan which had to be loosened by blasting before the dredger could operate. Of the 9,764.5 cubic yards actually removed, 5,500 cubic yards was of the silt. It will be remembered, also, that the first bid made by the subcontractor for the work on this item was $34,684, whereas they are now claiming approximately the same sum for sixty per cent of the work. The subcontractor also made, at the instance of the bonding company, an estimate of the cost of the work performed and the cost of the work necessary to its completion when the bonding company was negotiating with it for the completion of the work. In this estimate, it fixed the cost of the work performed at $22,500 and the cost of the work necessary to be performed at $29,870. The expert evidence as to the cost of the work was conflicting, but, taking the evidence in its

entirety, we are not persuaded that the trial court erred in its conclusion.

On the appeal of the subcontractor, therefore, we conclude that the appellant is entitled to recover against Jahn & Bressi, for the excavation, at the contract rate of $3.65 per cubic yard, and against the bonding company at the rate allowed by the trial court.

[5] On the appeal of the bonding company, the first contention to be noticed is that certain of the claims which the trial court allowed as chargeable against the bond were invalid because not filed within the time limited by the statute. The statute relating to the particular question is found at § 1161 of the code (Rem. Comp. Stat.). The statute, after providing in a prior section that a contractor for a public work shall give a bond to the municipality with which he contracts, conditioned for the faithful performance of the work and for the payment of all laborers, mechanics and materialmen who shall labor upon or furnish material for the work, and all persons who shall supply the contractor "with provisions and supplies for the carrying on of such work," further provides in the cited section that no person performing such labor, or furnishing such material, provisions or supplies shall have a right of action on such bond, "unless within thirty (30) days from and after the completion of the contract with an acceptance of the work" by the municipality, he shall file with the municipality a notice in writing setting forth the nature of his claim.

It will be remembered that the contract between the city and Jahn & Bressi was terminated on August 21, 1925, and that the unfinished work was let to another contractor, who finished it to the satisfaction of the city on April 9, 1926. The claims in question were for materials furnished to Jahn & Bressi while they were in the performance of the contract, and were filed more

than thirty days after they had ceased work thereon, but prior to the final completion of the contract by the subsequent contractor and its acceptance by the city. But while the contention is argued with earnestness and ability, we do not feel that we need follow the argument. The question presented is not a new one in this court. It was before us in *Puget Sound Power & Light Company v. Sparger,* 142 Wash. 85, 252 Pac. 544. In that instance, the city declared the contract forfeited and ejected the contractor from the work before its completion. The claim there in question was filed against the contractor's bond "about a year and seven months" after the city had terminated the contract, but before the work was finally completed, and we held the filing valid. The case concludes the question against the bonding company unless it is to be overruled, and this we are not inclined to do, notwithstanding the argument attacks the soundness of our conclusion. The reasons for the holding are stated in the opinion and need not be repeated here. We add only that theretofore we had held that the statute was not to be construed literally; that, while it seemingly limited the time in which claims could be filed against a bond to the period of thirty days following the completion and acceptance of the work, a claim filed prior to such completion and acceptance was not invalid. *Cascade Lumber Co. v. Aetna Indemnity Co.,* 56 Wash. 503, 106 Pac. 158; *McLeod v. Russell,* 59 Wash. 676, 110 Pac. 626; *Washington Monumental & Cut Stone Co. v. Murphy,* 81 Wash. 266, 142 Pac. 665; *Denny-Renton Clay & Coal Co. v. National Surety Co.,* 93 Wash. 103, 160 Pac. 1.

But we think the conclusion may be rested on another ground than the ground stated in the cited cases. It is at once apparent that the exigency here presented was not within the contemplation of the framers of the

statute.  While the statute requires the filing of claims in all instances, it makes no provision with respect to the time of filing, in an instance where the contractor incurs obligations and ceases work before the completion of the contract; particularly so where the abandoned work is never completed.  It would seem, therefore, that a condition is presented where a thing is required to be done and no time is fixed for the doing of the thing.  If this be the situation, then the general rule would be applicable, namely, that a claim filed within a reasonable time after the cessation of the work would be timely.  Taking this view of the situation, we can not hold that the claims in this instance were not timely filed.  They were filed before any adjustment of the differences between the city and the contractor were had or attempted, and no prejudice has resulted to the bondsman.

The trial court entered a judgment against the bonding company on a claim filed by the respondent, Moran Manufacturing Company.  After the appeal had been perfected in this court, the respective parties, through their counsel, stipulated for a reversal of the judgment without costs.  Our order with respect to the claim will be in accordance with the stipulation.

[6]  The city of Seattle, under separate contracts with Jahn & Bressi, entered into after the execution of the principal contract, furnished to Jahn & Bressi such electric energy and such water service as that firm found necessary to use in the performance of the work under the principal contract.  The city also furnished the labor and material and installed for them a telephone connection between the site of the work and their Seattle office.  For the first of these services Jahn & Bressi agreed to pay at the city's current rates, and for the second, they agreed to pay the cost of the labor and material, and pay a monthly rental for the

use of the telephones. For the electric energy fur-
nished, the city made a charge of $36,084.78; for water
furnished, a charge of $721.72; and for installing the
telephone connection and rentals, a charge of $434.76.
On the charge for electric energy, Jahn & Bressi, from
time to time, made sundry payments, the total aggre-
gating $11,648.36. The city filed claims for these sums
against the bond. The trial court, after deducting the
sum of the payments and certain small items which it
held not chargeable against the bond, entered judg-
ment in favor of the city against Jahn & Bressi and
the bondsman for the sum of $26,086.90.

It is the contention of the bonding company that no
recovery can be had against it for the claims on which
the judgment is founded. It invokes the general rule
that a creditor, having funds in his hands belonging
to his debtor, may not pay the funds over to the
debtor and then look for the payment of the debt to a
person secondarily liable for its payment. The learned
trial judge, while recognizing the general rule, thought
it inapplicable to the situation presented, citing and
relying on our cases of *Cowles v. United States
Fidelity & Guaranty Co.*, 32 Wash. 120, 72 Pac. 1032,
98 Am. St. 838; *Spokane v. Costello*, 42 Wash. 182, 84
Pac. 652. The first of the cases bears on the question
only to the extent that it announces the principle that
a compensated surety can not invoke the rule of
*strictissimi juris* the law accords a surety who volun-
tarily assumes the obligation. In the second of the
cases, it appeared that Costello had a contract with
the city of Spokane for the improvement of certain
of its streets, and that the contract obligated him
to protect the city from damages resulting from his
negligence. While the contractor was in the perform-
ance of the work, one Born was injured through the
alleged negligence of the contractor, and notified the

city of his claim of damages therefor. The city, after notice, accepted the work as completed, and paid the contractor in full therefor. Born afterwards obtained a judgment against the city upon his claim, and the city was permitted to recover over against Costello's bondsmen. The liability was contingent, and the judgment was rested on the somewhat peculiar wording of the contract between the city and Costello; the contract leaving the question whether the city would or would not withhold a part of the contract price to meet a contingent liability to the judgment of the city's representatives. The bond, of course, secured the contract, as it was written, and protected the city against any liability coming within its terms.

It is not our opinion that either of these cases supports the conclusion of the trial court in the present instance. The principle the bonding company invokes is not based upon any rule of favoritism shown a surety. It admits that the contract is to be construed liberally. The rule of liberal construction, however, of a surety's contract simply means that the contract shall be construed as contracts generally are construed when entered into between parties standing on an equal footing and competent to contract; that is to say, according to its evident intent and purpose, without favoritism to either of the parties. It does not require the violation of any general principle otherwise applicable to contracts.

Our later case of *Lewis County v. Aetna Accident & Liability Co.*, 111 Wash. 333, 191 Pac. 146, is more to the point. In that case, a contractor, constructing a road for the county, purchased the cement necessary to be used in the work of construction from the county. The contract of purchase required the contractor to pay for the cement used monthly. This the contractor did not do, and in the final settlement the county paid

the contractor in full for the construction work, leaving a large obligation due the county for the cement. The county sought to recover on the obligation from the contractor's bondsman, and this we held it could not do. The opinion collects the cases from other jurisdictions, showing that there is no substantial dissent in the authorities upon the question.

It is argued, however, that the surety was not injured by the city's neglect. But it does not so appear from the record. Possibly, had it been shown that the contractors applied the sums paid them by the city to the satisfaction of obligations which would otherwise have been chargeable against the bond, the city could recover on the theory of non-injury. But the city made no such showing, and the burden was on it to make the fact appear. No such presumption arises in its favor.

The objection that there were non-lienable items included in the claims allowed against the bondsman are largely directed to the claim of the city. Since we conclude that the city's claim as a whole is not recoverable, no further notice of the contention, as applied to the city, is necessary. Nor do we think we need notice specifically the objections to the others. They are of minor consequence, and an examination of the items making up the totals has not convinced us that the trial court erred in its conclusions.

Our conclusions require a modification of the judgment of the trial court in the following particulars:

(1)    The judgment of the appellant, Puget Sound Bridge & Dredging Company, against Jahn & Bressi will be reversed and the appellant allowed to recover against them in accordance with the written contract; its judgment against the United States Fidelity & Guaranty Company will stand affirmed.

(2)   The judgment of the Moran Manufacturing Company against the United States Fidelity & Guaranty Company will be reversed, without costs to either party, and a judgment entered in accordance with the stipulation of the parties affected.

(3)   The judgment of the city of Seattle against the United States Fidelity & Guaranty Company will be reversed and a judgment entered to the effect that the city take nothing by its action against that company.

(4)   Costs in the court will be apportioned by the clerk, subject to review by this court, should either party except thereto.

Parker, Holcomb, Tolman, French, Askren, and Mitchell, JJ., concur.

Main, J. (dissenting).—I dissent from that part of the majority opinion which holds that the subcontractor was entitled to recover more than the reasonable value of the services for item number 1. The contract, when read in the light of the subject-matter and the surrounding facts and circumstances, makes it clear that both parties understood that the prices specified by the graph were for a complete performance of the work. The subject-matter and the attendant facts and circumstances are material, not for the purpose of adding to or modifying the contract, but for the purpose of ascertaining the true intent of the parties from the language used. In order to perform the contract, it was necessary to assemble machinery and equipment at considerable expense. It was less expensive to remove the first material than it was that which would be removed before the contract was completed. The contract with the city was upon a unit basis and it could not be ascertained, until the work was performed, the exact number of cubic yards of earth that would be

removed.    The contract with the subcontractor was likewise upon a unit basis.    It is not claimed that the full performance of the contract was prevented through any fault of Jahn & Bressi, the contractors with the city and with whom the subcontract was made. As already stated, when the subcontract was made it was in the contemplation of the parties thereto that the subcontractor should complete all the excavation to be done for item number 1.    The sliding scale of prices fixed by the graph was necessary, because it could not at the time the contract was entered into be determined the exact number of cubic yards of earth to be removed.

Except as herein otherwise indicated, I concur in the majority opinion.