W. Harrison PRICE, Appellant,

v.

H. L. COBLE CONSTRUCTION COM-
PANY et al., Appellees.

No. 19951.

United States Court of Appeals
Fifth Circuit.

May 8, 1963.

Roderick M. MacLeod, Jr., Birming-
ham, Ala., Leader, Tenenbaum, Perrine

& Swedlaw, Birmingham, Ala., of counsel, for appellant.

Kenneth Perrine, Birmingham, Ala., for appellees.

Before TUTTLE, Chief Judge, and POPE * and JONES, Circuit Judges.

POPE, Circuit Judge.

The appellee H. L. Coble Construction Company (Coble), as prime contractor, entered into a contract with Housing Authority of the City of Bessemer, Alabama, for the construction of a multiple dwelling project known as Low Rent Housing Project No. Alabama 125–1–12. The applicable Alabama statute, Code of Alabama 1940, Tit. 50, § 16, provided that any person entering into such a contract with the State or any municipal corporation should be required to execute a performance bond "and in addition thereto, another bond with good and sufficient surety, payable to the state, county or municipal corporation or subdivision, letting the contract, * * * with the obligation that such contractor or contractors shall promptly make payments to all persons supplying him or them with labor, materials, feed-stuffs or supplies for or in the prosecution of the work * * *; and any person, firm or corporation that has furnished labor, materials feed-stuffs or supplies for or in the prosecution or repair of any public building or public work, * * * and payment for which has not been made, shall be authorized to institute an action upon said bond in his or their name or names and to have their rights and claims adjudicated in such action and judgment rendered thereon * * *."

Coble furnished the bonds required by the statute and the other appellees above named executed the bonds as sureties. Coble then entered into subcontracts with Bessemer Materials, Inc., (Bessemer) whereby the latter undertook to complete certain specified parts of the work contracted for by Coble and to furnish all materials, equipment and labor required in connection therewith.

This action is concerned with the furnishing of labor and materials in the construction of the roofs of the buildings in the housing project from the plate-line up. This included the construction of roofs on some 288 buildings.

After Bessemer had completed the work of constructing the roofs on the first of such 288 units, it was ascertained that the cost of labor alone for the installation of the materials, which included the installation of trusses, decking and roof frame, amounted to a sum in excess of $600. After that first unit was so constructed Bessemer sought to secure the furnishing of such labor at a lesser cost and entered into an agreement with appellant Price, which agreement is the basis of the action in the court below in which Price sought to recover upon the statutory bonds thus furnished by Coble.

Price, who was an experienced construction worker with special experience in building residences and in framing and constructing roofs, was asked by Bessemer to estimate the cost of furnishing the labor only for this roof work. He turned up with an estimate of $300 per unit. As Bessemer had originally estimated these labor costs at $352 to $399 per unit, Price's estimate of $300 per unit was extremely satisfactory to it. Price was instructed to go ahead with the work and to select and employ carpenters and workmen to provide the labor. He was to proceed until he had completed roofs on some thirty units, with the understanding that, if the work on the thirty units were satisfactory to Bessemer, he should proceed with the completion of the remainder of all 288 units.

Price was to supervise this work and was paid foreman's wages calculated at $3.37½ per hour for a 40-hour week. Price testified that it was the agreement that if the total cost of this labor on these roofs came to less than $300 per unit, he, Price, was to be paid by Bessemer the difference between this cost and what the

---

* Of the Ninth Circuit, sitting by designation.

$300 per unit would have amounted to. The wages were to be paid by Bessemer on the basis of the payroll sheets kept by Price and furnished to Bessemer. There was no undertaking by Price to keep within the $300 figure and, so far as the evidence shows, if the total cost had amounted to $350 or $400 per unit, Bessemer would have been responsible therefor.

After the first 30 buildings had been completed, it was ascertained that the labor costs on those buildings were close to $300 per unit. Price was then instructed to go ahead and complete the 288 units, and he did so. There is no question but that the labor was performed and completed in satisfactory fashion.

At the time the agreement was made between Price and Bessemer, a writing was drawn up which referred to the agreement and set forth portions of what had been agreed upon. That writing is set out in the margin.[1] It is obviously not complete. Its effect we shall discuss hereafter.

The record shows that in carrying out his supervisory duties in connection with this work, Price was required to work early in the morning and late at night beyond the time which would normally be required of him as a foreman. He worked Saturdays and evenings; his pay as foreman did not include any overtime and it was calculated on the basis of an eight hour day and 40 hour week. When he made up the payroll sheets they were delivered to Bessemer who in turn submitted them every week to Coble.

The agreement between Price and Bessemer was made early in March, 1960. Price's work was finally completed the last of July. During this period of time Bessemer failed and ultimately went into bankruptcy. Beginning in May Coble was obliged to take over the work and it advanced the money for the payrolls from that time on. Although Price had no direct dealings with Coble, Coble's superintendent in charge of the work testified that he had learned from Price during the progress of the work that he, Price, had "an agreement of some sort with Bessemer Materials on a profit sharing basis." Coble had also received from Price a letter dated March 22, 1960, (which is referred to more fully hereafter) which was signed "Harrison Price, Roof Framing Man."

1. "Bessemer Materials, Inc.
March 5, 1960
W. H. Price
Thorsby, Alabama
Phone NIagara 6–3920
RE: Bessemer Low Rent Housing Project 125–2–A
Dear Sir:
In agreement with our verbal conversation concerning the installation of trusses, decking and all roof framing from the plate line up.
We have estimated $300 for labor to install all the materials from the plate line up per unit. We propose to take an average on 30 buildings, if at this time you have saved us any money, then we will give you an allowable bonus for any amount you have saved Bessemer Materials.
All the work must be done in a first-class workmanlike manner, and in accordance to the plans and specifications prepared by Charles A. McCauley.
All the work must be done by union carpenters under the rules of the Carpenters Local.
Bessemer Materials will furnish all tools and equipment other than those specified under the Journeyman's normal requirements.
The materials for the job must not be wasted at any time, that is above the normal amount that is allowable. All work will be done under the supervision of Mr. Herman Summerford, or W. Eugene Dillard of Bessemer Materials.
Before any bonus is paid, however, we will deduct from the bonus about 12 per cent of the total payroll for workmen's compensation, public liability and etc.
This agreement can be cancelled after 30 units if so decided by Bessemer Materials or can be amended after 30 units to include the 288 units for the entire project.
Bessemer Materials, Inc., by W. Eugene Dillard.
    Agreed:
    (Signed) W. H. PRICE
        Witness:
            John C. Dillard."

The evidence on behalf of Price was that the total labor costs on the entire 287 units amounted to $16,208.25 less than the total of $300 times 287. Price asked for judgment for this sum together with interest, attorneys' fees and costs. Upon trial of the action before a jury, the court at the conclusion of all the evidence, directed a verdict for the defendants and judgment against the plaintiff and in favor of the defendants was entered thereon. This appeal followed.

The theory upon which appellant asserts that he was entitled to recover is a simple one. Referring to the Alabama statute he says that he is a person "that has furnished labor * * * for or in the prosecution" of a "public building or public work * * * payment for which has not been made." In arguing their respective positions here, both the appellant and the appellees have agreed that the Alabama statute was patterned upon the Miller Act, 40 U.S.C. §§ 270a–270d; that the purposes of the Miller Act and the Alabama statute are identical, and that they should be interpreted in the same manner. They agree that cases decided under the Miller Act are applicable to cases under the Alabama statute; and both parties rely heavily upon Miller Act decisions in undertaking to support their respective positions.

■ The appellee first contends that the judgment in its favor was compelled because Price was a subcontractor under a subcontractor, or as appellee put it, a sub-subcontractor. It argues that such a person is not covered by the provisions of the Alabama statute. To support this position it relies heavily upon Hardaway v. National Surety Co., 211 U.S. 552, 29 S.Ct. 202, 53 L.Ed. 321, and MacEvoy Co. v. United States for Use and Benefit of Calvin Tomkins Co., 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163.

The Hardaway case involved application of an earlier Act which preceded the present Miller Act. The earlier Act, called the Heard Act, was not in any respect here relevant different from the Miller Act. The bond in that case related to a contract for the construction of a lock and dam in Alabama, and Hardaway and his partner were denied recovery upon the bond. The court said that "they were not subcontractors in our view who undertake to furnish labor and materials upon a contract with the original contractor."

However, that case cannot aid the position of the appellees here for Hardaway and his partner obviously were not persons who furnished labor or materials since their agreement was one primarily to furnish funds to finance the completion of work under the contract. We can see no resemblance between the facts in the Hardaway case and the case now before us.

In the MacEvoy case, MacEvoy entered into a contract with the United States for the construction of a housing project and furnished the bonds required by the Miller Act. MacEvoy purchased building materials for use in the construction of the work from James H. Miller & Company. Miller in turn purchased these materials from the Calvin Tompkins Company. It failed to pay Tompkins and Tompkins caused the action to be brought against the prime contractor and his bondsman.

The Court noted that § 2(a) of the Act, 40 U.S.C. § 270b(a), contained the following proviso: "Provided, however, That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made." (p. 106 64 S.Ct. p. 893) It held that the meaning of this proviso was that aside from those materialmen, laborers, and sub-contractors who dealt directly with the prime contractor, the only ones who could recover under these bonds were "those material-

men, laborers and sub-subcontractors who, lacking express or implied contractual relationship with the prime contractor, have direct contractual relationship with a subcontractor and who give the statutory notice of their claims to the prime contractor." (322 U.S. p. 107 64 S.Ct. 893).

The Court defined a subcontractor within the meaning of the Act as follows (p. 109, 64 S.Ct. p. 894): "[A] subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen." The Court stated that if Miller, who furnished the materials to MacEvoy, was a subcontractor within the meaning of the proviso, then Tompkins could recover on the bond. But the Court held that Miller was not a subcontractor within the meaning of the Court's definition of that term and hence recovery was held improper.

It is clear that the decision in the MacEvoy case furnishes no support for the lower court's decision here, for it is quite plain and cannot be questioned that Bessemer was a subcontractor; and if Price, as claimed here, furnished labor to Bessemer, a subcontractor, Price comes within the protection of the Alabama Act, assuming that it is given the same construction as its prototype, the Miller Act.

Appellees also seek some comfort from this court's decision in Elmer v. United States Fidelity & Guaranty Co., 5 cir., 275 F.2d 89, 79 A.L.R.2d 852. That also was an action under the Miller Act. There Tyler-Hyde was the prime contractor with the United States, and the Miller Act bonds were furnished. Tyler-Hyde sublet the grading and asphalt paving to Scholes Company. Scholes in turn made a contract with Acme Asphalt Company to do the asphalt paving. Acme then proceeded to arrange with appellant Elmer to perform inspection and testing services. When Elmer was not paid and Acme became a bankrupt, Elmer sued the prime contractor and the surety on the payment bond. This court noted the rule laid down in the MacEvoy case, supra, and said "Scholes was a subcontractor of Tyler-Hyde. Acme had a direct contractual relation with the subcontractor Scholes and hence would have been covered by the bond." The court held, however, that since Elmer was not a subcontractor within the meaning of the Miller Act and did not have a direct contractual relationship with a subcontractor he could not recover. This view of Elmer's situation was further emphasized in the separate concurring opinion of Judge Rives who stated that the issue present was: "Whether a subcontractor several times removed, a 'sub-sub-subcontractor,' is such a 'subcontractor.'"

Such is not the issue present here. Rather, this case presents the situation described in the prior quotation from the Elmer case, namely, the one beginning "Scholes was a subcontractor", etc. Paraphrasing that quotation, we must say here: Bessemer was a subcontractor of Coble. Price had a direct contractual relation with the subcontractor Bessemer and hence would be covered by the bond.

That such was the view of this court in the Elmer case is further made plain by the court's citing with approval Basich Bros. Const. Co. v. United States for Use of Turner, 9 Cir., 159 F.2d 182. In that case Basich was the prime contractor for construction work for the United States and it furnished the Miller Act bond. It entered into a contract with Duque whereby the latter undertook to perform the requirements of certain items in the main contract. This work involved the production of gravel, rock and sand and delivery to the plant site. Turner and associates furnished trucks to Duque which were used in hauling these materials to the plant site. The court held that Duque was a subcontractor under Basich. Duque failed to pay Turner and associates who brought the action and recovered judgment against Basich and the sureties pursuant to the provisions of the Miller Act. The

judgment was affirmed by the Court of Appeals.[2]

It is apparent that in the present case Coble is in the position of Basich Bros., Bessemer is in the position of Duque, and Price is in the position of Turner and associates. The contention that Price cannot recover because he was a sub-contractor is wholly without merit.

■ The next contention made in support of the trial court's judgment is that Price's claim here is one for the recovery of profits and that profits may not be recovered in a case of this kind. Seemingly this is the argument which was accepted by the trial judge who made an oral statement of his views at the time he directed a verdict for the defendants. The court said: "The cases all hold that the contractor and his surety is not liable for profit that somebody might make on a contract." We cannot agree with this statement.

The cases are quite to the contrary. Assume what must be a typical case: A, prime contractor, with a contract to build three buildings in a government project, sublets the construction of one of them to a subcontractor. B, the subcontractor, in turn sublets the plumbing work to a plumbing contractor. The contract is let to the plumbing subcontractor at a stated or fixed price. For this the plumbing contractor furnishes labor and materials including the stipulated plumbing fixtures. If the plumbing contractor has to sue the surety company, the amount of his recovery is measured by the contract sum, and of course the contract sum includes the contractor's profit. If such a contractor cannot include a profit, he would not be in business. The language of the Alabama statute is consistent with the view that in such case the recovery would be based on the contract sum. The same is true of the language used in the Miller Act.[3] The cases support this view.[4]

Such was the view under the preceding Heard Act, which, in the respects here relevant did not differ from the Miller Act. Royal Indemnity Co. v. Woodbury Granite Co., 69 App.D.C. 364, 101 F.2d 689, 691–692. There the claimant entered into a subcontract to furnish the granite for a public building at a stated contract price. The surety asserted liability for no more than the reasonable value of the granite. Rejecting this attempted defense the court said: "The price charged for the materials was in accordance with the written contract between the general contractor and the claimant. It is not claimed or suggested that the contract was collusive or dishonest or that the parties—the general contractor on the one hand and the ma-

2. It was well settled under the earlier Heard Act that the sub-subcontractor would recover. United States for Use of Hill v. American Surety Co., 200 U.S. 197, 26 S.Ct. 168, 50 L.Ed. 437. The Alabama court gave the same construction to the earlier Alabama statute which, so far as is here relevant, is not distinguishable from the present Alabama statute. State, for Use of Wadsworth v. Southern Surety Co., 221 Ala. 113, 127 So. 805. There appears no reason why any different construction would be given the present statute.

3. The Alabama statute (Code of Alabama, 1940, Tit. 50 § 16) requires notice to the surety of "the amount claimed to be due". Where the subcontractor or the sub-subcontractor has fully performed a contract for a stipulated sum, it would appear that he would understand the "amount claimed to be due" to mean the unpaid balance of the contract sum. The statute then recites that if the surety does not pay "such claim in full" within 45 days the claimant shall be entitled to recover, in addition to "the amount of said claim" attorney's fees, etc. Had the legislature intended that the subcontractor, or the sub-subcontractor, should recover only his out-of-pocket expenses, his labor costs and material costs alone, it would seem to have been easy to say so instead of referring to the amount "due". The Miller Act (40 U.S.C. § 270b) grants the right to sue to the person who has furnished labor or material and who "has not been paid in full therefor."

4. We lay aside here those special cases where the contract price is fixed by collusion, fraud or overreaching at an unfair amount. Those are referred to hereafter.

terialman on the other—were not dealing at arm's length when it was made. * * While we are not prepared to say that in every Heard Act case involving a claim under a subcontract the surety is bound by the contract price, we think it may be stated with complete assurance that the surety is so bound except in a case of collusion, fraud, or such overreaching as will shock the conscience." [5]

The court in the Royal Indemnity Co. case, supra, noted that it had never previously been questioned in any federal court but that the surety must respond "in accordance with the terms of the contract." The novelty of such a question was noted by the Court of Appeals of Kentucky in Blair & Franse Const. Co. v. Allen, 251 Ky. 366, 65 S.W.2d 78, a case arising under that State's similar statute. Suit was brought by a subcontractor of a subcontractor. The court rejected the defenses urged by the surety, appearing to be somewhat astonished at its "nebulous" contention. The court said: "The next contention of the construction company and its surety is that the claim of the appellee is for profits, and hence not covered by the contract or bond. It is very difficult to get at this nebulous contention of appellants. The construction they put upon the transaction is a very strained one. As well said in appellee's brief: 'Certainly the requirement that the contractor pay for labor, material and supplies furnished in connection with the construction plainly means that it pay the cost to the contractor (general) for such labor, materials and supplies and therefore covers whatever profit third parties are making in furnishing such labor, material and supplies in the prosecution of the work. The appellants assume that the cost of labor, material and supplies is the cost of those parties furnishing the same, whereas the obligation of the appellants is to pay claims against themselves for the cost to themselves for such labor,

material and supplies.'" (65 S.W.2d at p. 80)

That the amount properly recoverable under the Miller Act by a subcontractor is the agreed contract amount without regard to whether the amount may or may not include profits, is plainly stated in United States for Use of Soda v. Montgomery, 3d cir., 253 F.2d 509, 511, where the court said: "As the trial court properly held, whether he was called a subcontractor is not material to the issue. His work was accomplished under the supervision and at the direction of Montgomery and he was entitled to be paid for it at the rate to which Montgomery had assented, even though the total may have been more than Montgomery obtained for it from the government under his own contract." The court there cited Ottinger v. United States for Use of Brown, 10 cir., 230 F.2d 405, 408, in which the court said: "The subcontract fixed the value of the services rendered; as to this value nothing was left to the discretion or judgment of the trial court." And even in the case of extra work furnished by a subcontractor without any stipulated sum, profits are included in his quantum meruit recovery. In Arthur N. Olive Company v. United States for Use & Benefit of Marino, 1 cir., 297 F.2d 70, 73, the court said: "Out-of-pocket expense is not the limit of the fair value of labor and materials." It had been argued that the subcontractor was not entitled to a profit on these extras but that they should be restricted to their actual cost. As indicated, the court rejected that argument. It cited Continental Casualty Co. v. Schaefer, 9 cir., 173 F.2d 5, 8, in which the court held that a subcontractor's recovery under the Miller Act for extra work performed, in the absence of any specified price or sum, "should be the reasonable value of the work and materials furnished *plus overhead and profits.*" (Emphasis ours.)

---

5. In accord is Burton v. F. A. Seifert & Co., 108 Va. 338, 61 S.E. 933, decided under the Heard Act. The court rejected the argument that the bond should be liable only for the value of the labor and materials furnished the contractor "and not for the profits and gains which an independent subcontractor might make out of a contract made by him with the general contractor."

The Supreme Court of Alabama agrees with these decisions to the effect that the contract price determines the amount recoverable by a subcontractor in cases of this kind. There are two decisions which that court has handed down involving an earlier Alabama statute (Gen.Acts, 1927) whose provisions were comparable to those in the present Alabama statute. In Ballenger Const. Co. v. Joe F. Walters Const. Co., 236 Ala. 548, 184 So. 275, the Alabama court said that the contract would determine the price to be paid a supplier of a shovel used by the contractor. In United States Fidelity & Guaranty Co. v. R. S. Armstrong & Bro., 225 Ala. 276, 142 So. 576, 579, the court was dealing with an action to recover from the contractor's surety for machinery rentals. The court said: "The contracts fixing the agreed rental prices were admissible. They fixed the measure of recovery unless shown to be unreasonable in amount." [6]

These two Alabama cases happen to be cases where the claim against the bond was made by a subcontractor. But the Alabama statute suggests no reason why any different test should be applied to a sub-subcontractor, such as the supposititious plumber we have mentioned or such as the sub-subcontractor in the Kentucky case of Blair & Franse Const. Co. v. Allen, supra. In any case, without distinction, the person entitled to sue is, by the statute authorized to sue for the amount "claimed to be due." In the case of a subcontractor, what is "due" is generally fixed by his contract. The same must be said to be true of the sub-subcontractor. [7]

There are a few cases which can be said to support a minority view that profits must be excluded from a recovery in cases such as this. None of them is logically supportable. The only one actually so holding which is cited by appellees is United States for Use of Helie v. Great American Indemnity Co., (D.C. N.H.) 30 F.Supp. 613. The only authority there cited for its singular holding is the case of Theobald-Jansen Electric Co. v. P. H. Meyer Co., 10 cir., 77 F.2d 27. That was a very different sort of case which in no respect supports that district court's decision. [8]

There are also some Washington cases, supported only in that state, which are opposed to the view we take here. They

6. That the Alabama court adopts a liberal view of the coverage of the Alabama statute appears from that court's unqualified approval of this court's decision in City of Stuart, for Use & Benefit of Florida East Coast R. Co. v. American Surety Co., 5 Cir., 38 F.2d 193, where we noted the necessity of adopting a liberal construction of statutes such as this. Central of Georgia Ry. Co. v. United States Fidelity & Guaranty Co., 223 Ala. 458, 137 So. 36, 38. The City of Stuart case, supra, quoted at length from Fulghum v. State, 92 Fla. 662, 109 So. 644. The Alabama court stated that the reasoning in City of Stuart "seems to us unanswerable." That reasoning was based in large part on the Fulghum case, supra. In Fulghum the court rejected an argument that "the subcontractor cannot recover his gross compensation based upon the unit prices agreed upon with the principal contractor, because those prices apparently included, in addition to the wages paid the laborers employed by the subcontractor, the hire of his teams, scrapers, tools, the subcontractor's profit on the job, his overhead expense for bookkeeping, accounting, etc., and depreciation on his stock and equipment, and that such a recovery is not contemplated by the statute or the bond." The court recites that the recovery is for "the agreed value of his work", and "at the agreed price". These cases are alluded to hereafter, in another connection.

7. The only exception to this rule that the contract sum should be the amount recoverable, an exception not applicable here, is where the contract price is fixed through collusion, fraud, or overreaching at an unfair amount, as noted in Royal Indemnity Co. v. Woodbury Granite Co., supra. This court had to deal with such a case in Massachusetts Bonding & Ins. Co. v. United States, 5 Cir., 88 F.2d 388. In that case some "so-called rental" of trucks (rentals would be recoverable) were "really the balance of the purchase price" of the trucks (purchase price would not be recoverable). This court said: "But, in order that the agreed rental shall be binding on the surety, it must be really a fair and actual rent."

8. In that case the court noted that Theobald-Jansen was not a subcontractor. "It furnished no materials and agreed to furnish none. Neither was it a laborer; it did not contract for wages of a

are cited in Puget Sound Bridge & Dredging Co. v. Jahn & Bressi, 148 Wash. 37, 268 P. 169. As noted by the court in Royal Indemnity Co. v. Woodbury Granite Co., supra, the Washington rule "rests solely on local authorities." We have no reason to believe the Alabama court would adopt this isolated view.[9]

■ We have noted up to this point that it is no objection to Price maintaining this action that he could be called a sub-subcontractor and also that, if the contract amount could be said to include something by way of profit, that too is no objection to his recovery. This brings us to the final question as to whether, within the meaning of the Alabama statute, he was a person supplying the contractor or subcontractor "with labor, materials, feed-stuffs, or supplies for or in the prosecution of the work", or whether he was a person "that has furnished labor, materials, feed-stuffs or supplies

for or in the prosecution * * * of any public building or public work." We think it quite plain that Price furnished labor in the prosecution of the work.

In this connection we refer not to the services furnished by the carpenters and other workmen hired by Price, (they were all paid by Bessemer or Coble as indicated above) but to the services performed by Price in overseeing the work, expediting it with a view to minimizing the cost, selecting and securing the workmen, making up the payrolls and other reports furnished to Bessemer and Coble, and supervising the work generally. The decided weight of authority is to the effect that such services, like those of supervisors, engineers and architects, are included within the term "labor" in statutes such as the one here involved.

In American Surety Co. of New York v. United States, 5 cir., 76 F.2d 67, this court was dealing with an action brought

---

laborer or a superintendent." The court found it to be merely in a position similar to that of Hardaway in Hardaway v. National Surety Co., supra. Furthermore, the claimant's rights had to be traced through the defaulting prime contractor who had adopted a "devious method" to "compel his own surety to pay a fabulous profit not covered by the bond."

9. This special Washington view was first expressed in Kongsbach v. Casey, 66 Wash. 643, 120 P. 108. At that time the Washington court purported to apply it only in the case of employees of a subcontractor on the ground that the prime contractor and his surety "were not in privity with the claimants." The later Washington cases, evidently recognizing that there was no basis for distinguishing between a subcontractor and one employed by a subcontractor, have extended their peculiar rule to the subcontractors themselves.

The Washington statute (Rev.Code of Wash., § 39.08.010) does not appear to differ from the Miller Act. The "not in privity" basis for the adoption of the Washington rule is plainly erroneous. Recovery in cases like this is not based on "privity" of contract at all. The right to sue is "by virtue of special statutory authorization." United States for Use of Birmingham Slag Co. v. Perry, 5 Cir., 115 F.2d 724 (Miller Act case of a sub-subcontractor). "Nevertheless the bond now in question was executed and deliv-

ered pursuant to a statutory requirement, by which the terms and scope of the bond were fixed by the statute. * * * In short, the law is written into the bond." Universal Electric Const. Co. of Alabama v. Robbins, 239 Ala. 105, 194 So. 194, 198–199 (Alabama statute case of a subcontractor). And compare United States Fidelity & Guaranty Co. v. Pressed Brick Co., 191 U.S. 416, 425, 24 S.Ct. 142, 144, 48 L.Ed. 242 (Heard Act case of a subcontractor) where the Court said: "The covenant is made solely for [the subcontractors'] benefit. The guarantor is ignorant of the parties with whom his principal may contract, the amount, the nature, and the value of the materials required, as well as the time when payment for them will become due. These particulars it would probably be impossible even for the principal to furnish, and it is to be assumed that the surety contracts with knowledge of this fact."

See also, Stickells, "The Miller Act", XXXVI Boston Univ. Law Review, 499 at 514: "If a right exists by these laborers and materialmen against the primary contractor, it is by way of statute."

At one time a California District Court of Appeals applied the Washington rule. Panama Commercial Co. v. Tingey, 26 Cal.App. 576, 147 P. 585. The later cases of Prince v. Hill, 170 Cal. 192, 149 P. 578, and H. G. Fenton Material Co. v. Noble, 127 Cal.App. 338, 15 P.2d 884, questioned and rejected that decision.

under the Heard Act; it involved the services of a laboratory which examined and tested gravel used on roads. The laboratory's recovery was affirmed.[10] This court also noted that the taking and preparation of the samples to be tested also involved some physical labor. In that respect the case resembles the one before us, for Price, too, was doing the work of a foreman which involved physical work as well as supervision, as above described.

It is well known that such Acts like the Miller Act and the Alabama statute were designed to give protection in connection with public buildings similar to the protection furnished by mechanics' liens on private work. Mechanics' liens statutes generally use the same phraseology relating to labor or materials. In interpreting mechanics' liens acts it is generally held that the language in the applicable statutes referring to work or labor include work done in superintending the erection of buildings or improvements on land. Such is the Alabama rule. In Hughes v. Torgerson, 96 Ala. 346, 11 So. 209, 16 L.R.A. 600, the court held that the Alabama statute then in force, providing for a lien for "work or labor upon * * * a building or improvement on land * * * ", included the services of an architect who was engaged in "the preparation of drawings, plans, and specifications for the building and in superintending the erection thereof." See also Wilkinson v. Rowe Surveying Co., 266 Ala. 675, 98 So.2d 435.[11]

Price not only performed the services mentioned but he furnished the use of saws, which were electric power saws, and a truck. John Dillard, testifying about this, said: "He furnished his saws and his truck which we needed very badly at that particular time." The truck was used to move materials to the job from where they were first piled in order to have them near the place of use, and to haul water for the crew, and "anything it was needed for." Price bought the gas for the truck; paid for its maintenance; paid the maintenance on the saws, and supplied electric cable or cord for use with the saws.

That the furnishing of such equipment is also the sort of thing which is covered by the bond is plain from the cases of Fulghum v. State, supra, City of Stuart v. American Surety Co., supra, and Central of Georgia Ry. Co. v. United States F. & G. Co., supra, the cases previously cited in footnote 6, supra. As indicated in that footnote, the Fulghum case was relied upon and cited at length in our City of Stuart case, (which in turn was approved in Standard Accident Ins. Co. v. United States, 302 U.S. 442, 58 S. Ct. 314, 82 L.Ed. 350), and both cases were quoted at length in the Central of Georgia Ry. Co. case which alluded to the reasoning in the City of Stuart case as "unanswerable." [12]

---

10. This court said (76 F.2d p. 68): "It may be true that the term 'labor' in this statute, as generally in statutes relating to mechanics' liens, refers to physical labor rather than technical and professional skill and judgment, but an architect or other skilled man who actually superintends the work as it is done is by the weight of authority furnishing labor. Breeding v. Melson, 4 W.W.Harr. (Del.) 9, 143 A. 23, 60 A.L.R. 1252, and note. It was so held under the federal statute where the superintendent did some manual labor in Bankers' Surety Co. v. Maxwell (C.C.A.) 222 F. 797. See, also Flagstaff Silver Mining Co. v. Cullins, 104 U.S. 176, 26 L.Ed. 704; Massachusetts Bonding Co. v. Steel (Tex.Civ. App.) 293 S.W. 647; Continental Bank v. North Platte Co. (C.C.A.) 219 F. 438;

Central Trust Co. v. Richmond, N. I. & B. R. Co. (C.C.) 54 F. 723."

11. This is the weight of authority. See Annotation "Mechanics' lien of persons supervising construction of building, etc.", 60 A.L.R. 1257, 1274–1279 (1929). The later cases on the subject not only support the majority view but seem to be unanimous to that effect. See for example: Mann v. Schnarr, 228 Ind. 654, 95 N.E.2d 138; Robert L. Weed Architect, Inc. v. Horning, 159 Fla. 847, 33 So.2d 648; Friedman v. Stein, 4 N.J. 34, 71 A.2d 346; Whitney v. McKay, 54 Wash. 2d 672, 344 P.2d 497.

12. Fulghum holds that under the comparable Florida statute labor performed with the aid of horses, tractors and derricks, and the transportation of materials

We do not feel warranted to extend this already long opinion to greater lengths by quoting at length from these three decisions, illuminating as they are, but taken together they demonstrate, we think, that the Alabama court would hold the furnishing of the use of power saws, the truck, and the like, covered by the bond here in question.[13]

In our view it makes no difference that the compensation agreed to be paid to Price for these services was to be calculated not on a monthly, weekly or hourly basis but on the basis of what Price was able to save under the $300 per unit figure. If the cases last cited establish a rule that an architect furnishes labor within the meaning of the Miller Act, there certainly could be no validity to a contention that the architect cannot collect if his compensation is calculated, as is usual, upon a percentage basis.

We note that there is no conflict in the evidence with respect to what Price's agreement as to his compensation actually was. Defendants put in evidence the letter previously referred to, signed by Price and dated March 22, 1960. That letter, addressed to Bessemer, contained the statement: "I have received payments in full every week from Bessemer Materials, as they are making the payrolls for me." This letter was written during the first few weeks of Price's work on the job, and at that time, as the letter stated, he had received weekly his compensation as foreman. Such payments as he might be entitled to for savings under $300 per unit could not at that date be ascertained. It is obvious that this letter constitutes no evidence that he did not have the contract which he claimed.

The terms of the contract are to be ascertained primarily from Price's testimony. The written memorandum, set forth above in footnote 1, is manifestly incomplete.[14]

It would appear from the writing, and it also appears from other testimony, that Price negotiated his deal with Eugene Dillard who was the executive officer for Bessemer. Eugene Dillard was not called as a witness. His brother, John Dillard who kept the books and payroll for Bessemer, testified as a witness on behalf of Price. He gave the background for the Price arrangement testifying that when the work on the roofs began the cost to Bessemer ran far above the estimates which he said had originally been $350 or $399 per house. "I know it ran way over our cost that we had anticipated it would, and it was a great concern to us." When Price entered into the arrangement and suggested the figure of

by barges is all "labor" within the meaning of the statute. It cites numerous cases to the same effect covering rental of railway cars, track and equipment, and cases holding that it makes no difference whether transportation so supplied be called labor or material.

13. In the City of Stuart, following Fulghum, we noted that the Florida statute is to be construed as having the same meaning as the federal statute, and we held properly recoverable freight switching and demurrage charges on carloads of material used in the performance of a contract with a city for public work. In the Central of Georgia case, the Alabama court held a claim for freight demurrage arising from carriage of material used in constructing a highway was properly recoverable under the earlier Alabama statute previously referred to.

14. We have no problem arising out of the so-called parol evidence rule since this is a case where the contract was partly oral and partly written. In ascertaining what the entire contract was, we look to see what the entire contract was, including the written and unwritten part. It is noted that the written memorandum covered only the first 30 units and contained no provision as to the method of arriving at what the writing called an "allowable bonus". See McCormick on Evidence, § 212; Wigmore on Evidence, 3d ed., § 2430. See also Roquemore v. Vulcan Iron Works Co., 151 Ala. 643, 44 So. 557, and Middleton v. Alabama Power Co., 196 Ala. 1, 71 So. 461, in which the following was quoted with approval: "[F]or when it thus appears that a part only of a complete oral contract, not within the statute of frauds, has been reduced to writing, parol evidence is always admissible to show what the rest of the agreement was."

$300 a unit, in the words of John Dillard, "we felt at that time that we had made a very sound bid." John Dillard testified that his brother "was extremely satisfied with the work and the progress."

There is no basis for any serious claim, indeed none is made, that Price's claimed compensation was excessive or not earned. Leon Coble, a vice-president of Coble, testified that in bidding on the whole job, Coble estimated that the cost of this labor on each unit would be $322.40. Walker, Coble's superintendent, testified that prior to giving his testimony he had made an estimate of the labor costs on these units and turned up a figure of $305.90 which did not include the labor costs on the erection of the trusses. Witness Bunkin, called by the defendant, estimated the cost at $341.45 per unit. Clearly enough Price earned his money.

■ While appellees seemingly do not attach any legal consequences thereto, they do set out one of the provisions in the subcontract with Bessemer which reads as follows: "It is hereby specifically agreed that the subcontractor will not sublet or transfer this subcontract, or any part thereof, without the written consent of the contractor." They proved that there was no such written consent obtained from Coble to permit the deal between Bessemer and Price. Appellees do not assert that this provision would operate to bar recovery by Price. Obviously, such a provision is void and ineffective under the provisions of the Alabama statute, which, as we have seen, contains mandatory and specific provi-

sions for the protection of persons in the position of Price. The parties cannot "restrict the liability written into the bond by the law in favor of those protected thereby." Universal Electric Const. Co. of Alabama v. Robbins, 239 Ala. 105, 194 So. 194, 198. It could hardly be contended that a prime contractor could frustrate the provisions of the statute by inserting a clause like that in his contracts with subcontractors.[15]

■ We cannot take seriously the contention made by appellee that appellant is barred from arguing error in the Judge's direction of a verdict because of appellant's failure to comply with Fed. R.Civ.P. 51 requiring an objection to an instruction before the jury retires. At the time that the court granted the motion for a directed verdict the Judge stated from the bench his reasons for granting the motion. This was in no sense an instruction or charge to the jury within the meaning of Rule 51.

We note that Price's version of his agreement was that he was to be paid the entire amount of the difference between the actual cost of the labor and a sum equal to 287 times $300.[16] On the other hand, Walker, Coble's superintendent, testified that when he talked to Price about his agreement, Price discussed with him the arrangement designed to make savings under the $300 per unit, and that his arrangement with Bessemer was that "if he saved them any money, said they were going to split it." This would be some evidence that Price's agreement was that his "allowable bonus" would be calculated by split-

15. Because this clause is plainly void, it is unnecessary to add the comment that even if it had validity it was plainly waived in this case since Coble's superintendent testified that he discussed with Price the arrangements which Price had made with Bessemer and that he knew of this throughout the period of Price's performance during his constant inspection of the work. In addition it appears that as early as May 6, 1960, Coble was furnishing Bessemer the funds to take care of the payrolls prepared and furnished by Price. Necessarily Coble must have

known that the corporate officers of Bessemer would not do this building with their own hands and that they would necessarily have to hire someone else to do the actual work on the job.

16. The actual labor cost was shown to be $62,403.35. To this was added as per the agreement 12 percent thereof for workmen's compensation, public liability and other incidental costs incurred by Bessemer. This 12 percent was $7,488.-40, which, when added, brought the total of $69,891.75. 287 x $300 = $86,100. Price claims the difference, or $16,208.25.

ting the savings between himself and Bessemer and the jury might infer that his agreement was that he was going to have one-half of these savings instead of all of them.

We hold that the court erred in directing a verdict for the defendant and entering judgment thereon. Accordingly, the judgment must be reversed and the cause remanded to the district court for a new trial.

It is so ordered.